### PAWNEE INDIAN TRIBE OF OKLA-HOMA v. UNITED STATES.

### No. 11.

United States Court of Claims.

Feb. 3, 1953.

Jones, Chief Judge, dissented in part.

Arthur B. Honnold, Tulsa, Okl., for appellant.

Ralph A. Barney, Oklahoma City, Okl., with whom were Asst. Atty. Gen. A. Devitt Vanech and Asst. Atty. Gen. James M. McInerney, for appellee. John F. Curran, Enid, Okl., was on the brief.

Wilkinson, Boyden & Cragun, Washington, D. C., amici curiae. Donald C. Gormley, Billings, Mont., of counsel.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

HOWELL, Judge.

This is an appeal by the Pawnee Indian Tribe of Oklahoma from a final determination of the Indian Claims Commission, dated July 14, 1950 (Indian Claims Commission Docket No. 10). On the eight claims presented in appellant's petition filed with the Commission under and pursuant to the Act of August 13, 1946, 60 Stat. 1049, 25 U.S.C.A. § 70 et seq., the Commission determined that appellant was entitled to recover specific amounts under claims numbered 6 and 7, and was not entitled to recover on the remaining six claims. This

appeal is from the Commission's final determinations on the first seven claims.[1]

### Claims 1, 2, 3, and 4

Appellant's first claim is for just compensation under Section 2(1) of the Indian Claims Commission Act, for a strip of land consisting of approximately one million acres located in north-central Kansas. Section 2(1) of the Act provides in part as follows:

"The Commission shall hear and determine the following claims against the United States on behalf of any Indian tribe * * *: (1) claims in law or equity arising under the Constitution * * *."

It is appellant's position that this land belonged to the Pawnee Tribe by virtue of aboriginal Indian title, and that the land was taken by the United States and assigned to the Delaware Tribe of Indians under the Delaware Treaty of September 24, 1829, 7 Stat. 327, without the consent of the Pawnees and without the payment to the Pawnees of any consideration.

Appellant's second, third and fourth claims are asserted under Section 2(3) of the Indian Claims Commission Act, which provides in part as follows:

"The Commission shall hear and determine the following claims against the United States on behalf of any Indian tribe * * * (3) claims which would result if the treaties, contracts, and agreements between the claimant and the United States were revised on the ground of * * * unconscionable consideration * * *.[2]"

Appellant urges that the consideration received by the Pawnee Tribe for land ceded to the United States under three separate ratified treaties of cession was grossly inadequate and unconscionable within the meaning of the above quoted provision.

The second claim concerns the Treaty of October 9, 1833, 7 Stat. 448, whereby the Pawnees ceded to the United States "all their right, interest, and title in and to all the land lying south of the Platte river." This cession is alleged to include the strip of land covered by the first claim. Roughly, the area of land so ceded is claimed by appellant to be bounded on the north by the Platte River in Nebraska, on the west by the line established by the Fort Laramie Treaty of September 17, 1851, 11 Stat. 749, on the south by the Arkansas River in Kansas, and on the east by a line beginning about 30 miles east of the Great Bend of the Arkansas River and running north-east to a point just east of where the Loup Fork of the Platte enters the Platte River. The amount of land included in this claim is alleged to be approximately 23,000,000 acres, for which the United States paid $119,000.

The third claim arises out of the Treaty of August 6, 1848, 9 Stat. 949, whereby the Pawnees ceded to the United States "all their right, title, and interest in and to" certain described land which included Grand Island, Nebraska, in the Platte River, and a strip of land paralleling the Island on the north bank of that river. The treaty included a map or plat of the area ceded which appellant alleges contains approximately 110,418 acres of land for which the United States paid $2,000.

The fourth claim arises out of the Treaty of September 24, 1857, 11 Stat. 729, whereby the Pawnees ceded to the United States "all their right, title, and interest in and to all the lands now owned or claimed by them, except as hereinafter reserved, and which are bounded as follows, * * *." There followed a description of the lands ceded in Nebraska, and a provision for a reservation in such lands. Appellant claims that the cession included at least 10,500,000 acres of land for which the tribe received less than five cents per acre.

---

1. This appeal is taken pursuant to section 20(b) of the Indian Claims Commission Act, supra, on the grounds that the Commission's conclusions of law are not valid and are not supported by findings of fact, and that the findings of fact, on the record as a whole, are not supported by substantial evidence.

2. Although appellant asserted its second, third and fourth claims on other grounds enumerated in clause (3) in addition to the ground of "unconscionable consideration," for the purposes of this appeal, it relies only on the latter ground.

The Indian Claims Commission made the following statement in denying claimant's first four claims:

"* * * that the claimant tribe is not entitled to recover on its first, second, third, and fourth causes of action for the reason that it has not been established that the Pawnee Tribe of Indians actually occupied and exclusively used and possessed any definite portion of the lands claimed under their first four causes of action, nor, was their exclusive occupancy and possessory right or title therein recognized or acknowledged by the defendant at the time the treaties of October 9, 1833, August 6, 1848, and September 24, 1857, were negotiated and concluded."

In its preliminary discussion of appellant's right to recover on the first four claims, the Commission was of the opinion that on the issues raised in the first four causes of action, "the first question to be determined is whether the claimant has established by the evidence that it had original Indian title to any of the land involved in the first four claims, at the time it was taken by or ceded to the United States." It was apparently the Commission's conviction that appellant had failed to establish a *prima facie* case with respect to any of the first four claims because it had failed to sustain the burden of proving, by a preponderance of the evidence, its exclusive use and occupancy to any of the lands involved.

In this appeal, appellant does not dispute the Commission's concept of the nature of the causes of action involved in the first four claims, nor the Commission's resulting position as to the burdens of proof. Appellant merely contends that the Commission's adverse findings of fact are not based on substantial evidence within the meaning of Section 20(b) of the Indian Claims Commission Act. In a brief filed by the *amici curiae* on September 10, 1952, the argument is advanced that the Commission erred as a matter of law in requiring appellant to initially establish as part of its *prima facie* case for unconscionable consideration[3]

arising in connection with a ratified treaty of cession and limits, that it actually owned and occupied to the exclusion of all other tribes, the area of land described and ceded in such ratified treaty, in the same manner as a claimant is required to establish its "Indian title" to land claimed to have been taken.[4] The position was taken that a claim for unconscionable consideration is contractual in nature, that the ratified treaty of cession creates a presumption of title in the party ceding the land, and that such presumption can only be rebutted by affirmative proof on the part of the Government that the area of land shown on the face of the treaty as having been ceded, was not so ceded, thus rendering the consideration paid for the land actually ceded, if any, not unconscionable.

For reasons which will appear hereinafter, we do not reach, in connection with the first four claims, either the question whether the Commission's findings of fact are based on substantial evidence, or the question raised by the brief *amici curiae* as to the nature of the causes of action involved in these claims and the resulting burdens of proof devolving on claimant and Government respectively. The latter matters were not called to the Commission's attention, and if they are pertinent to the issues in this case, we believe they should be briefed to and considered by the Commission in the first instance.

### Claims 1 and 2

Because the land alleged to have been taken by the United States from the Pawnees in claim 1 was later included in the area ceded to the United States under the Treaty of October 9, 1833, 7 Stat. 448, involved in claim 2, many relevant facts are common to both claims. The Commission treated the two claims together for that reason, and also because it supposed appellant had the same burden of proof to sustain in each claim.

The Commission found as an ultimate fact that the record did not support a finding that appellant owned any of the land encompassed in the first and second claims.

---

**3.** Section 2(3) of the Indian Claims Commission Act.

**4.** Section 2(1) of the Indian Claims Commission Act.

The Commission's findings of fact with respect to these two claims are numbered 1 through 8. Findings 1 and 2 relate to the composition of the tribe into four bands,[5] and ·the boundaries alleged in plaintiff's four claims to land north and south of the Platte.[6] Finding 3 describes the origins of the tribe in the far south or southwest, its migration northward to the Platte Valley, the fact that the first contact of the tribe by the white man was in 1541 in central Kansas, and that Marquette located the Pawnees in the Platte River valley in 1673; that the Republican Band of Pawnees had its villages on the Republican River near the present Nebraska-Kansas line until 1809 when they moved up to join the others on the Platte River and the lower courses of the Loup fork. Finding 4 concerns the making of the Delaware Treaty of September 24, 1829, 7 Stat. 327, providing for the conveyance to the Delawares of land in the fork of the Kansas and Missouri Rivers for a permanent residence of that Nation, and for an outlet ten miles wide extending west along the northern boundary line of the Kansas Indian reservation. In subdivision (b) of the same finding, the Commission finds that the outlet strip "here claimed by the Pawnees, was within the territory ceded to the United States in 1825 by the Kansas Indians by Treaty entered into on June 3, 1825 (7 Stat. 244)," quoting the first·provision of the Kansas treaty containing the description of lands ceded to the United States, and providing for the setting aside of a part of it as a reservation for the Kansas Indians to be later surveyed and marked under the direction of the President. The Commission then found (c) that the United States claimed full and complete title to the land included in this "outlet" strip as a consequence of the Treaty of 1825 with the Kansas Indians.

In finding 5(a) the Commission found that the Delaware Outlet was located in a territory that· had been hunted upon and roamed over by a number of Indian tribes that were hostile to·one another, and that the land had not been exclusively used and possessed by any one tribe for many years prior to September 24, 1829. The Commission further found (b) that in 1829 the four bands of Pawnees were living in permanent villages along the Platte and Loup Rivers in what later became the State of Nebraska, and that the Pawnee tribe did not, in 1829, actually occupy, use and possess, to the exclusion of other Indian tribes, any part of the outlet strip granted to the Delawares. This completes the Commission's findings with respect to the ownership of the Delaware Outlet.

Findings 6 and 7 relate to the Pawnee claim of ownership in the territory south of the Platte. The boundaries of the land claimed to have been ceded in the Treaty of 1833 are set forth above and include the portion of the Delaware Outlet involved in Claim 1. Finding 6(a) states that in 1833 and for several years prior thereto, there had been fighting among the Indians in the area south of the Platte and that the United States desired to restore order and peace in that area and to persuade the bands to give up the chase and change to agriculture because of the increasing scarcity of game. The Commission then sets forth the first three articles of the Pawnee Treaty of October 9, 1833, 7 Stat. 448,[7]

5. Grand Pawnees; Republican Pawnees; Tappage Pawnees; Skidi or Loup Pawnees.

6. The land involved in claims 1 and 2 is alleged to have the following boundaries: Beginning at a ·point just east of where the Loup Fork enters the Platte River, thence south along Range 2 east to approximately Township Line North 9, and then extending from that point southwest into Kansas to a point 25 or 30 miles east of the Great Bend of the Arkansas River in southern Kansas; thence westwardly following the Arkansas River to the Colorado State line; thence north 18 miles along the Colorado State line and then bowing eastwardly and north to the junction of the North and South Forks of the Platte River in Nebraska, and thence eastwardly along the southern bank of the Platte River to the place of beginning.

7. "Art. I. The confederated bands of Pawnees aforesaid hereby cede and relinquish to the United States all their right, interest, and title in and to all the land lying south of the Platte river.

and finds that the area of land ceded to the United States by Article I was unsurveyed and its boundaries not described in the Treaty. The Commission next finds (7(a)) that on the date of the execution of the Treaty, one band of Pawnees occupied a permanent village on the south bank of the Platte, and the other three bands occupied permanent villages on the Loup River north of the Platte. The Commission then finds (b) that the record in the case does not establish that the Pawnees actually occupied, used or possessed, to the exclusion of other Indian tribes, any part of the lands lying south of the Platte River, except an undefined area of land included within their one village site on the south bank of the Platte.

Aside from the quotations from the treaties, the Commission's findings with respect to the first two claims contain no findings of primary or evidentiary facts upon which the ultimate findings 5(b) and 7(b) can be said to have been based. In its opinion, however, the Commission recites a number of facts not mentioned in the findings and which the Commission appears to have relied on in reaching its conclusion that the Pawnees never owned, used, or occupied exclusively, any of the land encompassed in the first and second claims. It states, as in the findings, that the Pawnees and other tribes had been fighting over the hunting grounds south of the Platte, and included in these claims. It refers to no authority for this statement, and mentions specifically, as one of the participants in the fights with the Pawnees, only the Delaware Indians. The Commission then states that the Pawnees were "also having trouble from attacks by the Sioux Tribe on the north" and that the United States, aware of this situation, planned the establishment of a general peace among these hostile Indian tribes.

Next, the Commission refers to a letter, dated March 30, 1832, from "John Dougherty, Indian Agent, stationed at Fort Leavenworth Indian Agency," to the Superintendent of Indian Affairs at St. Louis "regarding the 'outlet' strip granted the Delawares," and notes that Dougherty reported the fact that the outlet led into the "heart of the country claimed by the Pawnees as their hunting grounds," and recommended that the government extinguish the Pawnees' claim to all their lands lying south of the Platte River. The Commission states that Dougherty recommended that until this particular land was assigned to an Indian tribe or tribes, it should be used as a common hunting ground in order to bring an end to the conflicts between the various tribes hunting on this land. Whether this is a valid interpretation of Dougherty's letter, we shall discuss hereinafter.

The Commission next points out that on October 8, 1833, Henry L. Ellsworth, Treaty Commissioner, met in council with the chiefs and leaders of the four Pawnee bands at the Grand Pawnee village on the south bank of the Platte. The Commission states:

"The record does not disclose what instructions were given Ellsworth for negotiating the 1833 treaty, but the minutes of the Council meeting, dated October 9, 1833, reveal that one of the main objects in making the treaty was the restoring of peace among the Indian tribes in that area, and to effect the civilization of the Pawnee; Ellsworth also suggested that the Pawnees

"Art. II. The land ceded and relinquished hereby, so far as the same is not and shall not be assigned to any tribe or tribes, shall remain a common hunting ground, during the pleasure of the President, for the Pawnees and other friendly Indians, who shall be permitted by the President to hunt on the same.

"Art. III. The United States, in consideration of said cession and for the purpose of advancing the welfare of the said Pawnees, agree to pay said bands annual-

ly, for the term of twelve years, the sum of forty-six hundred dollars in goods, at not exceeding St. Louis prices, as follows: to the Grand Pawnees and Republican villages, each thirteen hundred dollars, and to the Pawnee Loups and Tappaye Pawnee villages each one thousand dollars, and said annuity to said Grand Pawnees is in full remuneration for removal from the south to the north side of the Platte, and building again."

select delegates to accompany him to Ft. Leavenworth for the purpose of making peace with hostile tribes. Ellsworth advised the Pawnees that when the United States gave the Delawares their land it was not known that the Pawnees claimed any part of it. He told the Pawnees the United States was willing to aid them in agriculture and give them goods if they would cede their interest in the land lying south of the Platte River, with the Pawnees being permitted to retain hunting privileges in the land with other friendly tribes until it was assigned to a tribe or tribes. The Pawnees were also anxious for peace, as shown by the talks of the Pawnee chiefs, and they appear to have understood they were ceding their interest in the land lying south of the Platte River."

The Commission then concluded that the extent of, or description of, the land ceded, or what part of it was owned by the Pawnees under Indian title, does not appear to have been considered or discussed at any time by Ellsworth, the Pawnees, or by John Dougherty, who was present during the treaty negotiations and who was a witness to the treaty. The Commission next states that Ellsworth transmitted the treaty and later forwarded the talks had with the tribe in council, "without comment so far as the record shows"; that the treaty was approved and ratified by the Senate without alteration and proclaimed on April 12, 1834.

The Commission concluded that there was no indication that the Government or Ellsworth believed the Pawnees to have exclusively occupied any of the land ceded in 1833. In commenting upon the Dougherty letter of March 30, 1832, the Commission conceded that Dougherty apparently believed that the Pawnees *claimed* an area of land in the vicinity of the Delaware Outlet and had so claimed for many years, but noted that he made no reference to any definite area of land as being in the exclusive possession of the Pawnees. The Commission stated that there was no evidence that Dougherty's report was based on any investigation made by him of the existing facts regarding Pawnee claims, and the Commission concluded by saying:

"* * * we do not believe his report can be accepted as decisive in a case as important as this, *where there is no other evidence to support it.* His report did bring to the attention of the Government the fact that the Pawnees claimed as a hunting ground an area in the vicinity of the Delaware 'outlet' but we do not believe that the general statements made by Dougherty can be considered as charging the United States with knowledge of or recognition of Pawnee ownership of any definite area of land south of the Platte River." [Italics supplied.]

A review of the record indicates first, that the Commission has apparently confined itself strictly to the material placed in evidence by way of exhibits, and when passing on an exhibit which represents an excerpt from an official government document, the Commission has drawn inferences from the material contained in that excerpt without reference to the document as a whole. This practice has resulted in rendering the findings[8] based upon such excerpts somewhat speculative in character, and the conclusions drawn therefrom doubtful in the light of the facts as revealed by the complete document. For example, in the case of the Dougherty letter of March 30, 1832, the Commission states that Dougherty in that letter first brought to the Government's attention the Pawnee

---

8. Our reference to the Commission's "findings" at this point includes the various statements made by the Commission in its opinion concerning facts in the record which it considered relevant, but concerning which it failed to make any formal findings of fact as such. We do not believe that the method pursued by the Commission in making its formal findings of fact complies with the provision in Section 19 of its Act that the Commission's final determination shall include (1) its findings of facts upon which its conclusions are based. For the purposes of this appeal, we have treated the facts referred to in the opinion of the Commission as though they had been incorporated in formal findings of fact.

claim to the Delaware Outlet, that apparently no investigation had been made by him of such claim, and that the government had no knowledge of such a claim or any facts to support it other than the letter. These conclusions are not borne out by Executive Document No. 512 of which that letter is only a small part. Again, in discussing whether or not the Pawnee Treaty of October 9, 1833, was actually intended by the parties to have any bearing on the Pawnee claim to the land in the Delaware Outlet, as well as whether or not any definite area of land was understood by the parties as having been included in the cession, the Commission's statements that Commissioner Ellsworth apparently had no instructions regarding the Outlet claim, or the purchasing of any land at all from the Pawnees, that the Treaty was forwarded without comment from Ellsworth to the Secretary of War, and that the treaty's main purpose was to establish peace between the warring tribes, are also not borne out by Document 512, nor by House of Representatives Report No. 474 (23rd Congress, 1st Session) from which excerpts were also made and introduced in evidence by both parties and relied on by the Commission.

We are of the opinion that the Commission was at liberty to, and, indeed, by virtue of the Indian Claims Commission Act, was under a duty to examine these documents in their entirety in order to determine all the facts and circumstances concerning the Outlet claim and the meaning of the 1833 Treaty.

The Indian Claims Commission Act reflects the intent of Congress that the cases arising under that Act should be decided on a complete and full record concerning all the ascertainable facts. Realizing that many of the claims would be based on facts and circumstances concerning which there would be no possibility of testimony from living witnesses, and concerning which no accurate determinations could be made without reference to historical facts and ancient documents, Congress assigned an unusual and broad function to the Commission with respect to its investigatory powers wherever such an investigation was neces-

sary to a proper determination of an Indian claim. Section 13(a) of the Act, 25 U.S.C.A. § 70*l*(a), provides, among other things, for the taking and preservation by the Commission of the testimony of aged and infirm Indians whose knowledge of the facts of any of the claims filed might be of value. Subsection (b) provides:

"The Commission shall establish an Investigation Division to investigate all claims referred to it by the Commission for the purpose of discovering the facts relating thereto. The division shall make a complete and thorough search for all evidence affecting each claim, utilizing all documents and records in the possession of the Court of Claims and the several Government departments, and shall submit such evidence to the Commission. The Division shall make available to the Indians concerned and to any interested Federal agency any data in its possession relating to the rights and claims of any Indian."

Section 13(b) was first introduced as an amendment to H.R. 1198 at the suggestion of the Department of Interior. Its purpose was first explained in a letter dated June 11, 1945, from Secretary of Interior Harold L. Ickes, to Hon. Henry M. Jackson, Chairman, Committee on Indian Affairs, House of Representatives (Hearings before the Committee of Indian Affairs, House of Representatives, 79th Congress, 1st Session on H.R. 1198 and H.R. 1341, pages 113–115.) In commenting upon the then practice of presenting Indian claims to the Court of Claims under special jurisdictional acts, Mr. Ickes stated that in his opinion neither the attorneys for the Indians nor the attorneys for the Government were equipped to handle efficiently and with dispatch the tremendous amount of research often necessary to properly uncover all the facts pertinent to a claim; that much time and money were consequently wasted, and despite frequent duplication of research, incomplete records resulted. At page 114 of the Hearings, Mr. Ickes' letter stated:

"The Indian Claims Commission, proposed to be established by H.R.

1198 and H.R. 1341, is designed to end this largely futile waste of time and money by providing for a comprehensive examination and final determination of all those claims which merit settlement. It will result in an ultimate saving to the Government even though it may cost, during the few years of its existence, more in direct Federal outlay than the present method. Further, it will result in a substantial improvement in the Government's present unsatisfactory relations with the Indians in this respect."

The draft indicating amendments to H.R. 1198 proposed by the Department of the Interior contained the following comment with respect to the new Section 13(b):

"The second paragraph of the proposed amendment [b] provides for an Investigation Division to assist the Commission in discovering the facts relating to Indian tribal claims. This staff group would be in a position to make a careful search of the voluminous records relating to each Indian tribe or group of tribes for the purpose of locating, assembling, digesting, and collating the pertinent materials bearing upon the rights of the respective parties, including, of course, the United States. One reason for the long delays and heavy expense hitherto experienced in the trial of Indian claims has been the inordinate amount of work involved in searching through the massive accumulations of papers and accounts in the various depositories to find individual documents or items relating to the particular claim at issue. A systematic examination of the records as a whole by trained researchers would eliminate much duplicating and imperfectly done work, and would be economical both of time and expense. Moreover, many of the outstanding tribal claims involve series of transactions so lengthy and complex as to make it essential that the Commission have assistants upon whom it can rely for an *independent examination of the basic data.* Under the proposed amendment the attorneys for both sides and other interested parties would be entitled to a full disclosure of the materials collected by the Investigation Division." [Italics supplied.] [Hearings, p. 145.]

At page 131 of the Hearings, Mr. Felix Cohen, Associate Solicitor of the Department of the Interior, made the same explanatory statement to the members of the Committee. There was no debate on this amendment, which met with the unanimous approval of the Committee. While neither H.R. 1198 nor H.R. 1341 were enacted into law, during the following session, H.R. 4497 was introduced on October 25, 1945 in the House of Representatives, providing for the creation of an Indian Claims Commission, etc., and containing the amendment proposed and accepted during the prior session with respect to the establishment of a Division of Investigation to independently investigate the Indian claims on behalf of the Commission. In Senate Report No. 1715 (79th Cong., 2nd Sess.), made by Senator O'Mahoney from the Senate Committee on Indian Affairs to accompany H.R. 4497, and dated July 15, 1946, he made the following statement, at page 5, under his "Analysis of the Bill":

"This bill, as amended, proposes to create an Indian Claims Commission to investigate and determine the facts and the merits of Indian tribal claims against the United States existing prior to the passage of the act, and to report its findings with appropriate recommendations to Congress.

"The Commission would be composed of three Commissioners, appointed by the President with the advice and consent of the Senate, and would be equipped with the usual powers of a fact-finding commission to hold hearings and to examine witnesses. The Commission is directed to establish an Investigation Division and to 'make a complete and thorough search for all evidence affecting' claims before it through the investigations in the field and in Government records."

Throughout the debates in both Houses of Congress, and in the discussions of the Senate and House Committees considering

the various bills to establish an Indian Claims Commission, there is obvious the desire on the part of Congress to establish a means whereby Indian claims against the United States should be finally and expeditiously settled so that there would no longer be the necessity for the passage of special jurisdictional acts, and with the hope that a fair and complete settlement of such claims would ultimately reduce the cost to the Government of aiding the various tribes. It was anticipated that with the settlement of these claims, many Indians would abandon their connection with the tribes and their dependence upon the United States. It was intended, in order to effect this end, to give the Commission the broadest possible powers and to give it every facility to insure the most complete treatment possible of the claims. Section 13(b) of the Act was proposed by the Department of the Interior and adopted by the Congress as an important means for bringing about the desired results.

We understand that the Commission has followed the Congressional direction and has established a Division of Investigation. Section 13(b) of the Act does not make mandatory the referral of every claim to the Division for investigation, but the clear intent and purpose of the Act would, we think, indicate the desirability of referring a case such as the present one, if not prior to the holding of hearings, then certainly after the far from adequate record was placed before the Commission by the parties. Congress contemplated the final settlement of these Indian claims on the basis of *all* the available facts, most of which are to be found in official government records or are matters of national history. Such an investigation can be, and was intended to be, as valuable to the Government in its defense of such claims as to the claimants in their prosecution thereof. The record on which the Commission bases its final determination of any Indian claim may well be not only the record made by the parties, but that record supplemented, whenever necessary, by the results of the Commission's own investigation into the facts of the case. Whether that investigation is made prior to, during, or after the hearing,

in a particular case, or whether it is made at all, is left to the discretion of the Commission. While it is undoubtedly true that it is not every case that will require much in the way of an independent investigation by the Commission, this case appears to us to be one peculiarly in need of the application of Section 13(b) of the Act.

An independent investigation into facts which are either recorded in official government documents or are matters of national history, has been resorted to by both trial courts and appellate tribunals. In the case of Coffee v. Groover, 123 U.S. 1, 8 S. Ct. 1, 31 L.Ed. 51, the Supreme Court had to determine whether the assumption of the court below, that the territory containing the land in controversy was ceded by Georgia to Florida, was well founded. 123 U.S. at page 11, 8 S.Ct. at page 6, the Supreme Court stated:

"The case, if it can be avoided, ought not to be decided upon a narrow selection of facts which might determine the question one way, before one jury, to-day, and another way, before another jury, to-morrow; but upon a broad view of all the historical events which relate to this boundary line. We shall proceed, therefore, to review these events as far as they have come to our knowledge from public documents."

The Supreme Court then proceeded to review the claim in the light of facts contained in various documents not called to the attention of the court below and not considered by that tribunal in reaching its decision. Among the documents referred to by the Supreme Court were the American State Papers, Vol. I, of Public Lands; Treaties and Conventions between the United States and Other Powers (Washington, 1873); Ellicott's Journal (Philadelphia, 1803; Andrew Ellicott was the Government Commissioner who, with a surveyor to assist him, marked the boundary line in May 1796, in conjunction with another Commissioner appointed by the Government of Spain); Senate Executive Documents (No. 77 and No. 152, 23rd Cong., 1st Sess.); and Resolutions and Enactments of the Florida and Georgia Legislatures. From all the historical and documentary

material referred to, technically outside the record, the Supreme Court concluded that the agreement between Florida and Georgia "was not in fact, and cannot be construed as, a cession of territory on the part of Georgia." The judgment below was reversed for factual error and the cause remanded for further proceedings.

To the same effect was the case of Jones v. United States, 137 U.S. 202, 11 S.Ct. 80, 34 L.Ed. 691, in which the Supreme Court referred not only to the sort of documents mentioned in the Coffee case, supra, but "refresh[ed] their memory and inform[ed] their conscience" by means of a series of unpublished letters between the Secretary of State and various persons, deeming such sources to be "most trustworthy". 137 U.S. at page 216, 11 S.Ct. at page 85.

In the case of Underhill v. Hernandez, 168 U.S. 250, 18 S.Ct. 83, 42 L.Ed. 456, in determining the correctness of the lower court's factual determination as to the existence of civil war in Venezuela, the Supreme Court examined for the first time in the case, material in the Archives of the State Department, and on the basis of correspondence between the Secretary of State and the United States Minister to Venezuela, determined that a state of civil war did exist in that country and accordingly affirmed the judgment of the lower court. "That these were facts of which the court is bound to take judicial notice, and for information as to which it may consult the department of state, there can be no doubt." 168 U.S. at page 253, 18 S.Ct. at page 85.

In the case of the New York Indians v. United States, 170 U.S. 1, 18 S.Ct. 531, 42 L.Ed. 927, the United States Supreme Court reversed the judgment of this court against the Indians after a consideration of the record before this court, supplemented by material not called to this court's attention by counsel for the parties, and not considered by this court in reaching the conclusion that the New York Indians had abandoned their claim to certain Kansas lands. Although the various documents considered by the Supreme Court were called to *their* attention, the Supreme Court might have considered them without such

prompting, on the authority of Jones v. United States, 137 U.S. 202, 214, 11 S.Ct. 80, 34 L.Ed. 691, cited by the court in support of its use of these documents.

■■ Accordingly, whether or not the Commission had taken judicial notice of historical facts and official government documents, published, or unpublished, and in the archives of the department concerned, as it might do under the general law applicable to this type of case, and as it was specifically authorized to do in its enabling legislation, this court is at liberty to examine and consider the facts contained in such sources in determining whether the Commission's final disposition of these claims is warranted by all the available facts present in official government records. In reviewing the record on this appeal, we carefully examined all the material presented to the Commission by the parties and we became persuaded that many pertinent facts had not been called to the Commission's attention. The absence of certain facts which, in a case of this kind would normally be expected to exist, was noted by the Commission in its opinion, i. e.; the lack of formal instructions to the various treaty commissioners who represented the Government in its negotiations with the Pawnees in 1833, 1848, and 1857; the lack of reports of investigations, if any, carried out by the treaty commissioners, and the lack of a formal report accompanying each of the treaties finally negotiated. We accordingly examined in their entirety documents from which excerpts had been submitted to the Commission, and documents referred to in the Archives List of Indian Treaty documents. We finally became convinced that the record physically before the Indian Claims Commission was entirely inadequate to form the basis for the just, equitable, and final disposition of the first five claims. For the convenience of the Commission, we shall summarize the material which we believe the Commission may wish to take into consideration in reconsidering these claims.

The story of the Pawnee Indians and their relation to the Government of the United States begins with the Louisiana Purchase in 1803 and the Lewis and Clark

Expedition in 1804. By that time the Government had already been faced with the problem of removing the Indians from the eastern states which, by then, were becoming thickly settled by its white citizens. Pursuant to legislative authorizations from time to time, the President had caused the negotiation of various treaties with the eastern Indians effecting the cession of their lands in the east to the United States in exchange for lands farther west. By 1800 it had become apparent that the lands assigned to the so-called emigrant tribes were not located far enough west, and it was realized by the Government that for the good of the white population as well as for the welfare of the Indian tribes, a territory much farther west would have to be found for the location of tribes already moved once, and for those who had not yet consented by treaty to give up their eastern possessions and remove inland. The acquisition of the large territory embraced in the Louisiana Purchase from France in 1803 was important, among other reasons, as a solution to the problem of finding a territory which might become a permanent home for the various Indian tribes.

As noted by the Commission, the first major expedition to the Pawnees of which there is an official government record was that of Lewis and Clark in 1804. A report of that portion of the Expedition which investigated the tribes indigenous to the newly acquired territory, is to be found in American State Papers, Indian Affairs, Vol. I.[9] At page 707 of the report there appears a "Statistical View of the Indian Nations inhabiting the Territory of Louisiana, and the Countries adjacent to its Northern and Western Boundaries." Of help in evaluating appellant's claim that it exclusively occupied as hunting ground in the manner that Indians occupy land, the land south of the Platte, are the "statistics" gathered by Lewis and Clark relative to the rivers on which their villages were situated in 1804, the places at which their trade with the whites

was carried on, the Indians with whom they were at peace or at war, and the location of their hunting grounds. A study of the information gathered respecting the Pawnee tribes and the neighboring tribes of Osage, Kansas, Otoe and Missouri, and the Omaha Indians, reveals that the village locations of those tribes were approximately the same in 1804 as in 1833, and that they carried on their trade with the whites in the vicinity of their villages; that the Osage were at war with all other tribes; that the Kansas were at war with all tribes except, occasionally, the Otoes and Missouris; that the Pawnee tribes were at war with all tribes except the Otoes and Missouris and certain tribes residing in what later became Nebraska. As to hunting grounds, the report states that the Grand Pawnees hunted on the south side of the Platte River and on the "head of the Kansas" River in a country of which a great portion was said to be open plains interspersed with groves of timber. This would indicate a hunting ground in southern Nebraska and northern Kansas. The Pawnee Loups are reported to have carried on their hunt on the Wolf River (Loup Fork of the Platte) and on the Platte River, above the mouth of that river in what is now Nebraska. The Republican Band of Pawnees were reported to hunt on the Republican River in what is now southern Nebraska and northern Kansas. The Kansas Indian hunting grounds are described as being on the "upper part of the Kansas and Arkansas rivers" in what is now east central Kansas. The Osage are said to have hunted along the Arkansas and Osage Rivers and nearly up to the Kansas River in southern Kansas.

In American State Papers, Indian Affairs, Vol. II,[10] Document No. 155 therein relates to treaties consummated around 1818 by the United States with various Indians in the area in question,[11] including four separate treaties of peace and friendship made with the four bands of Pawnees in June, 1818. Document 155 contains a

9. American State Papers, Indian Affairs, Vol. I (Serial No. 07), pp. 707–721.

10. American State Papers, Indian Affairs, Vol. II (Serial No. 08), pp. 164–180.

11. The treaties were for the most part treaties of peace and friendship, some pursuant to Article 9 of the Treaty of Ghent between the United States and Great Britain, 8 Stat. 222.

letter,[12] dated July 9, 1818, from William Clark and Auguste Chouteau to Secretary of War Calhoun, in which the Pawnees are described as a warlike and powerful tribe inhabiting the country in the vicinity of the Platte "stretching immediately between us and the Spanish settlements with whom they are now at war." It was the writers' opinion that, because of their great number and the commanding position they occupied in relation to the Missouri trade, and the "contemplated establishment at the mouth of the Yellow Stone river," and because of the consequent ease with which they might "be sent down in force upon our extended western frontier," the United States should cultivate their friendship "in conformity with the general policy of the Government."

Document 202[13] in the same volume of the American State Papers (18th Cong., 1st Sess.) dealt with a proposal to hold treaties with the tribes beyond the Mississippi for the preservation of the fur trade. Certain documents appearing in Document 202 had been communicated to the Senate on March 18, 1824 by Mr. Benton from the Committee on Indian Affairs. At page 451 appear the answers of Mr. R. Graham, United States Indian Agent, to questions put to him by the Senate Committee on Indian Affairs on February 10, 1824. Answering questions of the Committee relative to the United States' trade with the Spanish in Santa Fe, Mr. Graham stated that such trade was subject to interruption on the Arkansas River by the "Comanches, Arrepahas, Pawnees, and Osages" who all crossed the Santa Fe trail in their hunting or war parties and were likely to steal horses from the Santa Fe traders if they met up with them. Mr. Pilcher, another witness before the Committee, testified that among the tribes with which he was personally acquainted, were the four bands of Pawnees, "a very numerous tribe, whose villages are also on the river Platte, about one hundred and fifty miles from the Council Bluffs;" [the Otoes and Missouris had their villages on the Platte River also.] He mentioned the Sioux bands of Indians as having no fixed residence, but as wandering over a vast section of the country "on the right and left banks of the Missouri."

In 1824 Congress was considering the problem of extinguishing Indian title to lands in Missouri and removing such Indians west of the Missouri River. The Report[14] of Mr. Benton from the Committee on Indian Affairs, stated in part, as follows:

"The country immediately west of the State of Missouri and the Territory of Arkansas, to the extent of several hundred thousand square miles, is owned by the Osages and Kanzas. Their ownership is merely nominal. They occupy no more than four or five points, where their villages are situated; all the rest is idle, or only used for hunting; for which purpose, it is becoming daily less valuable with the daily decrease of game. The acquisition of a part of this ground for the specific purpose of being assigned to other friendly Indians, it is believed, would not be a difficult task. A tract binding on the western boundary of Missouri and Arkansas, stretching from the Red river to the Missouri, with a breadth of say one or two hundred miles, might be divided into portions suited to the numbers in each tribe, and a portion assigned to each. The Kanzas and Osages would, of course, retain a division suitable to themselves."

Document 218, 18th Cong., 2nd Sess.,[15] is a report to the Senate on a plan for removing the several Indian tribes west of the Mississippi River. Included in this report is a letter, dated January 24, 1825, from Secretary of War Calhoun to the President[16] stating that it would be necessary to acquire a sufficient tract of country

---

12. American State Papers, Indian Affairs, Vol. II (Serial No. 08), p. 176.

13. Id., pp. 448–457.

14. American State Papers, Indian Affairs, Vol. II (Serial No. 08), p. 512, ff, Document No. 211. Benton's report was communicated to the Senate on May 14, 1824.

15. Op. cit., p. 541.

16. Op. cit., p. 543.

west of Missouri and Arkansas for a permanent home for the tribes proposed to be removed; that the country between the Red and Arkansas rivers had already been allotted to the Choctaws; that the country north of the Arkansas and immediately west of the State of Missouri was then being held almost entirely by the Osage and Kansas Indians, and that the purchase of a portion of this land should be made soon. The Government was interested in acquiring a strip of land just west of the borders of Missouri and Arkansas for the resettlement of various emigrant tribes, including the Delawares, Kickapoos, Shawanees, Weas, and Piankeshaws. In his December 6, 1825 report [17] on the expenditures of the Indian Department and the state of the Government's relations with the several tribes, the head of the Office of Indian Affairs reported to the Secretary of War, among other things, that treaties of cession had been concluded with the Osage and the Kansas Indians and reservations secured to those tribes.[18]

In Document 226,[19] dealing with a number of treaties concluded and sent to the President in January, 1826 (including the trade and friendship treaty of September 30, 1825, 7 Stat. 279, between the United States and the Pawnee bands), there is a letter from Brig. Gen. Atkinson and Indian Agent Benjamin O'Fallon, dated November 7, 1825, giving information concerning the various tribes with whom treaties had just been made. Speaking of the Otoes who resided on the Platte, 25 miles south of the Missouri, the writers said that the tribe went on the hunt twice a year "sometimes to the south, to kill buffalo; but most commonly of latter years, hunt on the Missouri, below the Platte, for elk, deer, etc., as the Pawnees make objection to their killing buffalo on their lands." Of the Pawnees, the writers said they were a numerous and strong band, well armed and abundantly supplied with mules and horses, and that

they "hold a prominent stand among their neighbors as a warlike and brave nation." It was pointed out that the Pawnees were at peace with their neighbors and were enemies of the "Sioux, Osages, and other distant tribes. They cultivate corn, pumpkins, squashes, etc. They leave their villages in the spring and fall, and go far into the plains to the south, west, and northwest, in pursuit of buffalo, and succeed in supplying themselves with an abundance of the flesh of that animal for food, and their skins for robes." The letter speaks of their friendship with the whites and predicts that their good conduct will probably continue. Another letter appearing in this document, from William Clark to the Secretary of War Barbour, recommends the location of the Delawares, Shawanees, Piankeshaws, Peorias, Weas, Senecas and Kickapoos on a strip of country, purchased from the Kansas and Osage, immediately west of Missouri. On this same subject Thomas McKenney of the Office of Indian Affairs, wrote to the Secretary of War (December 27, 1826) warning him that little was actually known of the new country where it was proposed to settle the emigrant tribes, and a thorough exploration and investigation should be made to determine exactly how the indigenous tribes felt about having the emigrants moved into the lands recently ceded by the Osage and Kansas, and where they would become neighbors.[20]

Pursuant to the Act of May 24, 1828, 4 Stat. 315, appropriating money to defray the expenses of delegations of Choctaws, Creeks, Cherokees, and Chickasaws, "and such other tribes of Indians as may be disposed to send delegations west of the Mississippi for the purpose of exploring the unoccupied lands of the United States without the limits of the states and territories, preparatory to the final emigration of said Indians", an expedition was organized, and delegations from the various

17. Op. cit., Document No. 223, 19th Cong., 1st Sess., p. 584.

18. Osage Treaty, June 2, 1825, 7 Stat. 240; Kansas Treaty, June 3, 1825, 7 Stat. 244.

19. American State Papers, Indian Affairs, Vol. II (Serial No. 08), pp. 605, 606.

20. American State Papers, Document No. 245, Indian Affairs, Vol. II (Serial No. 08), p. 699.

tribes accompanied government representatives to visit the Osage and Kansas Indians, and examine the country available for assignment to the emigrants. This country was located in what is now Kansas. Rev. Isaac McCoy, a Government surveyor, accompanied the expedition, and in a letter to the Secretary of War, dated January 29, 1829,[21] he reported that the emigrant delegation liked the country but were disappointed at seeing no buffalo. McCoy stated that he later discovered their Osage guide and interpreter had deliberately not taken them the additional few miles necessary to find buffalo because of his-fear of Pawnee war parties. McCoy proposed that an Indian territory be established to be bounded on the north by the Niobrara and Missouri Rivers; on the northeast by the Missouri River; on the east by the states of Missouri and Arkansas, and on the south by the Red River. The western boundary of what McCoy considered to be "habitable land" was marked by a straight line running due north and south about 200 miles west of the eastern boundary of the proposed territory. He stated that he was exceedingly embarrassed by the fact that much of the land visited had already been assigned, and that actually little remained of the land acquired by cession from the Kansas and Osage Indians for assignment to new emigrants. It was McCoy's opinion that the assignments already made were too large in most instances and that, as a consequence, much of the assigned land would eventually have to be repurchased by the Government to be given to new emigrants. He deplored the practice of granting "outlets" to the hunting grounds, recognizing the Indian practice of considering their hunting grounds as much their own as their village sites, and realizing that it would be nearly impossible

to publish and enforce the limits of separate small hunting grounds for the emigrant tribes. He suggested finding some way of acquiring a large tract from the indigenous Indians to be used as a common hunting ground for all the tribes in the area, indigenous as well as emigrant.

From the above it appears that prior to the advent of the emigrant tribes along the eastern border of Kansas, the "uninhabitable" area beginning about 200 miles west was divided into fairly well defined areas for hunting purposes with the Osage hunting in the south, the Kansas in the east central, and the Pawnees (and their friends by permission) in the northern parts of Kansas.

The emigrant tribes were settled along the eastern border of Kansas on land acquired from the Osage in the south and the Kansas in the central and northern portions. From the various reports, the best hunting grounds for buffalo appear to have been controlled by the numerous and strong Pawnee bands, and the outlets proposed for the emigrant tribes north of the Kansas reservation (established 1825) would have led the emigrant bands into land claimed and controlled by the Pawnees. In 1829, the Government concluded a supplementary treaty with the Delaware Nation wherein that tribe were given as an outlet, a strip of land ten miles wide immediately north of the Kansas Indians' reservation as established in their treaty of 1825. Delaware Treaty of September 24, 1829, 7 Stat. 327. To Isaac McCoy was assigned the task of surveying the Kansas reservation and later the Delaware Outlet. In connection with the survey of the Delaware Outlet, Mr. McKenney wrote [22] to General William Clark, Superintendent of Indian Affairs on

---

21. U. S. 20th Cong., 2d Sess., 1828–1829, Reports of Committees, House of Representatives No. 87, p. 6 (Serial No. 190). .

22. U. S. Senate, 23rd Cong., 1st Sess., 1833–1834, Senate Executive Document 512 (Serial No. 245), p. 8. This Document, from which the parties have introduced in evidence excerpts by way of exhibits, and from which the appellant's attorney read passages into the tran-

script at the hearing before the Indian Claims Commission, contains a great deal of helpful information relative to appellant's claims 1 and 2.. The document consists primarily of the correspondence "on the subject of the Emigration of Indians between the 30th November, 1831, and 27th December, 1833." The material in the Document was furnished in response to a Resolution of the Senate, dated December 27, 1833. .

June 5, 1830, advising him to inform the agents for the Indians owning the country over which Mr. McCoy might travel, of the purpose of his work, and to secure McCoy's safe conduct.

In April, 1831, Isaac McCoy wrote [23] to Secretary of War John H. Eaton advising him of the completion of the surveys of the Kansas reservation and of the Delaware Outlet. McCoy stated that the Delaware Outlet line was terminated on the Solomon River about 140 miles west of the western village occupied by the Kansas Indians on the south, and about 40 miles west of the Republican Pawnee village on the north.[24] He then pointed out the apparent ambiguity concerning the northern boundary of the Kansas cession as described in the Treaty of June 3, 1825, particularly that portion which mentioned the "source of the Kansas river, leaving the old village of the Pania Republic to the West;". In that connection he stated:

> "I am of the opinion that, from the source of the Great Nemaha to the source of the Kansa, the course is little, if any, south of west. It would have been more proper, therefore, to have said that the old Pawnee village should be left to the *north* than to the *west*. In running the northern line of the Delaware outlet, we barely escaped coming in contact with the limits above mentioned, by passing some six or eight miles south of the above mentioned 'old Pawnee village.' But should the line, according to the late treaty, [Kansas—1825] incline southwardly somewhat, as has been heretofore supposed, then the termination of our late survey must have been within the Pawnee lands; and, if another outlet should be set off north of our late survey, it would run still further on to the Pawnee lands (p. 436)."

Mr. McCoy advised the wisdom of making a purchase of lands from the Pawnees who,

up to that time, had not been asked by the United States to cede any of their territory.

On July 22, 1831, Pawnee Agent John Dougherty wrote [25] to General William Clark, Superintendent of Indian Affairs, on the subject of the hostilities between the Pawnees and the Delawares. He mentioned the killing of three Delaware Indians by the Pawnees in the winter of 1829 and stated that the affair occurred "high up on the Republican fork of the Kanzas, and within the country claimed by the Pawnees as their hunting ground;". Dougherty pointed out that the Delaware chief had been told that at that time the Pawnees did not know who the Delawares were and probably thought them to be Osage Indians (traditionally enemies of the Pawnees), and that the Delawares were on land claimed by the Pawnees when they were attacked. Dougherty expressed particular concern over the determination of the Delaware chief to go with a hunting party "towards the mountains—which will, if persisted in, certainly lead him into the heart of the country claimed by the Pawnees as their hunting ground, and will, it is presumed, should they meet, bring him and his party in direct conflict with the Pawnees." Dougherty pointed out that the Pawnees viewed the Delawares in the same light as they did the whites and that if an open break should occur between the two tribes, it might adversely affect the harmonious relations between the whites and the Pawnees, and interfere with the white traders who had been passing over the Pawnee lands on their way to and from the mountains. He stated:

> "The anticipated result of things between the Delawares and Pawnees might, it would seem to me, be arrested, and its horrid consequences prevented by such interference. This would be effectual, either by preventing the Delawares from going at all on the Pawnee lands to hunt, or by obtaining from

23. Senate Executive Document 512 (Serial No. 245), pp. 430–440.

24. Read into transcript by appellant's counsel, p. 179.

25. National Archives (RG 75), Records of the Bureau of Indian Affairs, Letters Received, 1831 Delaware File.

the Pawnees privilege for them to do so. Objections may be urged against the means suggested, of preventing the Delawares from going on the lands of the Pawnees to hunt, as our Government has already promised them by treaty and in fact has marked for them, a pass-way of ten miles wide, leading into that very country, and directly on the lands claimed and owned by the Pawnees, as a hunting ground, ever since our acquaintance commenced with them. The Delawares are fully sensible that our Government has guaranteed to them this pass-way or hunting road, and seem determined to avail themselves of it. They might, therefore, have some just grounds of complaint against us, were we, immediately after making the road for them, to step forward, and prevent them passing out on it to hunt. Situated then, as we are in relation to the parties, I would most respectfully recommend, that at as early a time as practicable, and if possible before the Delawares go on their contemplated hunt, the Pawnees be assembled, and a perfect understanding had with them on the subject, and the privilege, for the Delawares to hunt on their lands, be obtained, and their differences, whatever they may be, settled and put to rest."

In a letter dated August 26, 1831,[26] General Clark transmitted the above letter to Secretary of War Lewis Cass stating:

"I agree with Mr. Dougherty as to the necessity of preventing further serious difficulties between those tribes by a timely interference of the Government and think his plan of procuring for the Delawares permission from the Panis to hunt on their land, a good one * * *"

On August 18, 1831, Isaac McCoy wrote[27] to the Secretary of War, stating that in his report of January 1 to the War

Department, he had recommended the extinguishment of the Pawnee claim to so "much of their country as the Government will require in the prosecution of the plan of locating all the tribes in this western region" (p. 565). He observed that obstacles to the extinguishment of their claims would increase every year. He stated that Major Dougherty, agent for the Pawnees and other bands, was in favor of the plan, and that a yearly annuity of $1,000 to each of the Pawnee bands would undoubtedly purchase land sufficient to serve the Government's purposes.

In a letter[28] dated October 29, 1831, from John Dougherty to General Clark, Superintendent of Indian Affairs at St. Louis, Dougherty told of the smallpox epidemic among the Pawnees. The letter also contains the following pertinent statement:

"They [the Pawnees] stated that their neighbors, the Ottoes and Omahas, were receiving an annuity from their great father for some wild lands, and that he [the great father] had surveyed off a portion of the Pawnee land and given it to his Delaware children, for which they hoped he would have pity on his Pawnee children also, and do for them as he was doing for his Otto and Omaha children."

On November 9, 1831, John Dougherty wrote to[29] General Clark stating that he had written to the Delaware Agent, Major Cummins, on the subject of the difficulties between the Pawnees and the Delawares. He informed General Clark that a party of Delawares had gone through Pawnee country on a trapping expedition, and that he thought the emigrant tribes should be restrained from buffalo and beaver hunting expeditions. On December 20, 1831, General Clark wrote to Elbert Herring, Commissioner of Indian Affairs in the War Department, and sent to him the last mentioned letters from Major Dougherty.[30] General Clark made the following state-

26. National Archives (RG 75) Records of the Bureau of Indian Affairs, Letters Received, 1831 Delaware File.

27. Senate Executive Document 512 (Serial No. 245), pp. 561–566.

28. Id., pp. 718–719.

29. Id., p. 721.

30. Id., p. 718.

ment and recommendation to the Commissioner of Indian Affairs:

"Enclosed herewith I have the honor to transmit to you three letters from Mr. Dougherty; one of the 29th October, stating the sickness and mortality among the Panis,[31] and their wish to receive an annuity, to which they conceive themselves entitled, on account of a portion of their lands having been surveyed, as they state, and given to the Delawares.

"I would recommend that a council be held with the Republican band of Panis for the purpose of extinguishing their title to such portion of their land as is embraced in the tract assigned to the Delawares; and that they be allowed a reasonable compensation therefor."

It was apparently General Clark's thought at that time that it would only be necessary to deal with the Republican Band of Pawnees in settling the matter of the Delaware Outlet.

On January 31, 1832, Commissioner of Indian Affairs Herring replied [32] to General Clark, acknowledging his letter and its recommendations with respect to the Pawnee claim, and stating:

"I am instructed by the Secretary of War to desire you to investigate the title of the Panis to the land claimed by them, and conveyed by the United States to the Delawares; and to communicate the results of such investigation, together with your free and full views and opinion on the subject matter of your letters, that the department may afterwards decide on the course to be pursued."

On February 16, 1832, Secretary of War Lewis Cass wrote.[33] to the President of the United States forwarding to him the Creek memorial and noting the number of Indians who had emigrated (in all 19,390,

with 16,570 more expected that same season). He remarked that because of the imperfect state of the Government's knowledge of the topography of the country, it was impossible to know precisely the quantity of land previously ceded to the United States, the amount already granted to the "transplanted bands," and how much remained for future assignment. He recommended that the indigenous tribes be visited by representatives of the Government to impress them with the power of the United States, to explain the fact that the emigrant tribes being moved into the area were under the protection of the United States and would be defended from all harm at the hands of the indigenous bands. He then proposed that the whole subject be submitted to Congress with a recommendation for the appointment of three commissioners "to whom the whole matter may be committed." These three commissioners "should examine the country thoroughly, ascertain and report its extent, fertility and advantages; adjust, if possible, the existing difficulties about boundaries; determine the proper positions of the tribes who are yet to migrate; and inquire whether further cessions" from the indigenous bands are necessary and can be "obtained without injury to them" (p. 780).

On March 1, 1832, General William Clark answered [34] Herring's letter of January 31, 1832, in which Herring directed Clark to investigate the Pawnee claim to the Delaware Outlet lands and make recommendations. General Clark stated that it was not in his power to comply satisfactorily with the wishes of the department regarding an investigation of the title of the Pawnees to the land claimed by them and conveyed to the Delawares unless he was furnished with the surveys made by Isaac McCoy. He requested that McCoy's surveys and field notes on the Delaware Outlet lands be sent to him.

On March 6, 1832, Isaac McCoy wrote [35]

31. The Pawnees were often referred to as the "Panis."

32. Senate Executive Document 512 (Serial No. 247), pp. 754–755.

33. Id., p. 767–781.

34. Senate Executive Document 512 (Serial No. 246), p. 225.

35. Id., pp. 230–241. Most of this letter was read into the transcript of testimony before the Commission at pages 142 and 143, by appellant's counsel.

to Lewis Cass, Secretary of War, stating that the Osage were being prevented from hunting buffalo by the Pawnees who also made trouble with the Delawares whenever the latter attempted to go on the hunt. He renewed his suggestion relative to the early extinguishment of the title of the Pawnees, Omahas, and others in the northern part of "what we term the Indian territory," to so much of such country as might be necessary.

The next document of importance is the Dougherty letter [36] of March 30, 1832 to General Clark. It is this letter on which appellant placed great reliance and which was given little weight by the Commission. From the previous correspondence appearing in Document 512, published at the order of the Senate, it is apparent that the Commission was wrong in assuming that the Pawnee claim first came to the Government's notice as a result of this letter. It is also apparent that an investigation *was* made of the Pawnee's claim to the land in the Delaware Outlet upon order of the Secretary of War, transmitted through Herring, Commissioner of Indian Affairs, to Clark, Superintendent of Indian Affairs at St. Louis, and by him referred to John Dougherty, Pawnee agent. The first paragraph of the Dougherty letter refers to a letter from General Clark dated March 17, 1832. That letter does not appear in Document 512.[37] The portion of the Dougherty letter relied on by appellants is as follows:

"In reply, I beg leave to say, that the portion of land embraced in that tract [the Delaware Outlet] extends, perhaps, one hundred and fifty miles in length, by ten in width. It must be observed, however, that this slip of land leads into the heart of the country claimed and occupied by the Pawnees as their hunting ground; and over which they regularly pass when going south for buffalo and other game. * * * Those hunting grounds through, and to which that slip leads,

are and have been, since the country was first known by the whites, claimed and owned by the Pawnees. Thus it will be seen, that if the Government should purchase the particular slip named, and make no additional arrangement with the Pawnees, in regard to their hunting lands in that region, that the evil intended to be remedied, will, in a great degree, still exist. I would, therefore, most respectfully recommend, that the Government extinguish the Pawnee claim to all the lands lying south of the Great Platte. This would give us an additional tract of considerable extent, on which, should it be thought expedient and proper, to locate emigrating Indians. Until which time, however, it might serve, by the permission of our Government, as a common hunting ground; and if held by the Indians in that way, would most likely put a stop, in a very great measure, to conflicts between the several hunting parties.

"As it respects the probable amount of annuity that it would require to effect the object contemplated, I suppose that the sum of five hundred dollars, to each of the four tribes, for ten years, would be sufficient to induce the Pawnees to relinquish claim to the particular slip assigned to the Delawares; but that if a purchase is made of all their lands south of the Platte, which I conceive should most certainly be done, it may require an annuity of one thousand dollars to each of those tribes. Should a treaty of purchase be made with the Pawnees, I would most seriously recommend, that all four of the tribes be considered as equally interested, and receive equal benefits; because they certainly constitute but one nation, although separated into four distinct villages. * * * They appear to have separated into four villages for the pur-

36. Id., p. 308. In evidence as claimant's Exhibit No. 7.

37. Much of the correspondence of William Clark is not on file at the National

Archives in Washington. It was acquired by the Kansas Historical Society and is in their possession in Topeka, Kansas. See Memorandum No. 102 of the National Archives, dated March 21, 1938.

pose of convenience. and comfort, in consequence of the great number in the nation; * * *[38]

"Whether they hold claim to the lands in question, by conquest, or by ancient possession, I am not able to determine. That they had possession of that region of country, and occupied it as a hunting ground on our first acquaintance with them, is, I think, pretty certain; and that they have continued that possession down to the present moment, is also equally certain. And, furthermore, they have ever considered their hunting lands intruded on by other tribes, if found there; and, in most cases, have treated other Indians, when found hunting on those lands, as enemies; except such of the small neighboring tribes [Otoes and Missouris and the Omahas] who obtain permission of them, and accompany them in their hunts. I must consider their claim to that country as resting pretty much on the same base as the claim of all other Indians is to the land on which the whites first find them; and, consequently, should we obtain it from them, for the use of other tribes, or for any other purpose, that we ought to use the same means, and be governed by the same principles, which we are in our purchases from all other Indian tribes."

This letter from John Dougherty was forwarded to the Secretary of War Lewis Cass by General William Clark on April 25, 1832, in a letter of that date,[39] in which he said:

"I have the honor to enclose to you, herewith, a report from Major Dougherty of the 30th March last, on the subject of the Panis claim; which is all the information I have been able to procure in regard to their title to the slip of land promised the Delawares for an outlet. And in the absence of the field-notes of the survey made by Mr. McCoy, I can only express an opinion of the correctness of Major Dougherty's estimate, as to the quantity which they claim. Yet I see no cession to the Delawares for the slip of ten miles in width, further than the Kansas reservation, which I am informed does not extend further west than fifty or sixty miles from the northeast corner of said reservation of 1825. I am informed the lines ran by Mr. McCoy extended to about 150 miles west; passing, in that direction, within about five miles of the Panis village."

The following paragraph of the same letter was read into the transcript at page 143 by appellant's counsel:

"I am of opinion that it would be good policy to hold a council with the Panis, not only for the purchase of such of their land as has been promised to the Delawares, but of that portion of their country which lies between the Kansas [Reservation] lines and the river Platte. The compensation for which, should be to place them upon the same footing with the other tribes of the Upper Missouri."

General Clark closed his letter with a recommendation that the agent should be authorized to call together the four bands and negotiate a treaty of cession, probably the following August before the bands departed for their fall hunt.

As we shall see, Mr. Dougherty's findings and recommendations were adopted by the War Department although Mr. Dougherty was not, as General Clark suggested, authorized to negotiate the proposed treaty with the Pawnees. Following the suggestion of Secretary of War Lewis Cass of February 16, 1832, supra, to the President of the United States, Congress passed the Act of July 14, 1832, providing for the appointment of three commissioners to

38. This recommendation to purchase from all four bands is in contrast with General Clark's earlier recommendation to Commissioner Herring that the purchase be made of the Republican Band.

39. Senate Executive Document 512 (Serial No. 246), p. 307.

treat with the Indians "and for other purposes." 4 Stat. 595. Under that Act the Commissioners to be appointed were authorized to examine the country set apart for the emigrating Indians west of the Mississippi River, and whenever necessary, enter into negotiations for the adjustment of boundary disputes, or of any difficulties in locating the lands of the emigrating tribes. The Commissioners were also authorized to convene the hostile tribes for the purpose of making peace and resolving any difficulties between them. The Commissioners were directed to report to the War Department concerning their activities and to recommend a plan for the "improvement, government, and security of the Indians."

On the same day that the Act was passed, July 14, 1832, Secretary of War Cass wrote to Messrs. William Carroll, Montford Stokes and Robert Vaux,[40] informing them that they were to receive commissions appointing them to visit and examine the country set apart for the emigrating Indians west of the Mississippi. There was enclosed a copy of the Act of July 14, 1832, and a copy of the map of the country referred to. The letter then proceeded to outline their duties in greater detail and among other instructions the letter contained the following:

"It is an important object with the Government to establish a permanent peace among all the tribes, indigenous or emigrant, west of the Mississippi. The fear of hostilities arises from the habits and dispositions of the Panis, Camanches and their kindred tribes. It is impossible for the department with the information before it, to point out the best mode in which these tribes can be approached, and a final termination put to their hostile and predatory incursions. The whole subject is referred to you. You will take the best measures to effect the object, after having procured all the necessary information. I consider this among the most important subjects committed

to you. By the act of May 28, 1830 [4 Stat. 411], the Government has guaranteed protection to all emigrating Indians, and the pledge thus given can only be redeemed by the employment of a sufficient protecting force, or by inducing all these tribes to live in amity with one another (pp. 872–873)."

Later in the letter of instructions, a further instruction was given the Commissioners:

"I enclose you copies of communications from General Clark, respecting a claim of the Panis to a tract of country which has been assigned to the Delawares. This subject you will investigate, and if you find the Panis claim correct, you will endeavor to make such an arrangement as will be satisfactory to them. The suggestions of Major Dougherty are entitled to weight, and the plan proposed by him is referred for your consideration. * * * Your particular attention is requested to the existing difficulties between the Delawares and Panis (p. 874)."

As noted above, the Dougherty-Clark correspondence concerning the Pawnee claim had been forwarded by Clark to the War Department, and it was this correspondence, including Dougherty's letter of March 30, 1832, that was passed on to the three Commissioners with the recommendation that Dougherty's suggestions be given weight. Apparently the Commissioners did give much weight to Mr. Dougherty's views, since they followed them almost to the letter in negotiating the Treaty of October 9, 1833, with the Pawnees.

The above letter of instructions to the three Commissioners is the letter of instructions of which the Indian Claims Commission stated they had no knowledge and therefore did not know what the Commissioners were told to do, if anything, respecting the Pawnee claim. Copies of this letter of instructions were sent to General Clark of St. Louis,[41] on July 14, 1832, and to John Dougherty on July 16, 1832,

40. Senate Executive Document 512 (Serial No. 245), p. 870.

41. Senate Executive Document 512 (Serial No. 245), p. 876.

with the request that he help the Commissioners in any way he could.[42]

Messrs. Carroll and Vaux were unable to serve as Commissioners, and Henry L. Ellsworth and the Rev. Schermerhorn were appointed and served in their places, along with Governor Montford Stokes, originally appointed. Ellsworth and Schermerhorn were sent copies of the same letter of instructions and the enclosures. On August 4, 1832, Acting Secretary of War Robb wrote [43] to the three Commissioners recommending to them Rev. Isaac McCoy who had been employed in making the surveys of the Kansas Reservation and the Delaware Outlet, among many other surveys. Robb expressed the Department's great confidence in McCoy's opinions. On September 22, 1832, Robb wrote to General Clark to explain why there had been such a delay in sending him the field notes of McCoy's survey, as requested by the General, and promised him by the Department on April 27th. He stated that when the three Commissioners were appointed in July, the maps and field notes were forwarded to them. He then stated that he was enclosing the original of the field notes for Clark's use and subsequent return to the Department in Washington, and that the map would be sent to him shortly.[44]

On October 15, 1832, Isaac McCoy, Government Surveyor, wrote [45] to the "Commissioners West" recommending the extinguishment of so much of the title of the Pawnees, and of other tribes on the Upper Missouri, as might be requisite to "make room for the emigrants." On November 30, 1832, John Dougherty, Agent for the Pawnees and others, wrote a letter [46] to General William Clark informing him that the War Department had requested him to assist the Commissioners "in completing a satisfactory arrangement of this question." Dougherty recommended that the months of August, September, or October of the following year would be the most suitable for the transaction of business with the Pawnees, who would then be back from the summer hunt, well supplied with game, and easily assembled.[47] On the following May 24, 1833, Commissioner Schermerhorn wrote [48] to Secretary of War Cass stating that if the Government should "think proper to purchase from the Pawnees the country south of the Platte, west of the Missouri, according to the views communicated by Major Dougherty," he would appreciate having definite instructions from the Department on the subject.

The next few months were extremely busy ones for the three Commissioners. Commissioner Stokes, because of ill health, was unable to travel much of the time, but Commissioners Ellsworth and Schermerhorn appear to have been on the move almost constantly in an attempt to accomplish the several objects assigned to the Commission. On July 20, 1833, Commissioner Stokes wrote [49] to Secretary of War Cass concerning a council held with the Osage in an attempt to persuade them to move to a tract near the Kansas Reservation. Commissioner Stokes felt that his colleagues did not accord sufficient weight to the recommendations of Col. Chouteau whose reliability had been recommended to the Commissioners by the War Department. He also commented that the Osage were compelled to fight the Pawnees and the Comanches on every excursion made to the buffalo grounds. On August 17, 1833, Secretary of War Cass wrote to the three Commissioners reminding them that the

---

42. Id., p. 879.

43. Id., p. 895. For some unexplained reason this letter is addressed to the three men originally asked to serve, although a week earlier Henry Ellsworth acknowledged a letter of Secretary of War Cass, dated July 23, containing his appointment as a Commissioner.

44. Copies of McCoy's field notes are also in Topeka, Kansas, in the files of the Kansas Historical Society.

45. Senate Executive Document 512 (Serial No. 246), pp. 486–497.

46. National Archives (RG 75), Records of the Bureau of Indian Affairs, Upper Missouri File.

47. National Archives (RG 75), Records of the Bureau of Indian Affairs, Upper Missouri File.

48. Senate Executive Document 512 (Serial No. 274), pp. 416–417.

49. Id., p. 480.

amount of money available for the accomplishment of their duties was limited and that the Department was particularly anxious to receive their views as to the best method of regulating the internal concerns of the Indians in that territory (one of the purposes of the Act of July 14, 1832), for submission to the next session of Congress. In the last paragraph of this letter, Secretary Cass responded to the complaint voiced in the Stokes letter by stating, "I must request again that you will consult with Col. Chouteau in the further prosecution of your business," and reiterating the Department's confidence in Chouteau's knowledge of Indian affairs. This letter was introduced in evidence by defendant as its Exhibit No. 77, for what purpose it is not clear.

On September 21, 1833, Commissioner Ellsworth, on behalf of the United States, concluded a treaty of cession with the Otoe and Missouri Indians, 7 Stat. 429. The cession in the first article of the treaty was of all their right and title to the lands lying south of the following line:

"Beginning, on the Little Nemohaw river, at the northwest corner of the land reserved by treaty at Prairie du Chien, on the 15th July 1830, in favor of certain halfbreeds, of the Omahas, Ioways, Otoes, Yancton, and Santie bands of Sioux, and running westerly with said Little Nemohaw, to the head branches of the same; and thence running in a due west line as far west, as said Otoes and Missourias, have, or pretend to have any claim."

On September 23, 1833, Commissioner Ellsworth forwarded the Otoe treaty to Commissioner of Indian Affairs Elbert Herring with a cover letter of the same date. This letter is to be found in the National Archives in the Senate Records. It informed Mr. Herring that Ellsworth found

the Otoe's title good "much farther south than the line marked as the northern boundary of extinguished title," apparently referring to the northeastern boundary of the Kansas cession of 1825, since the letter continues:

"The last treaty of extinguishment was made with the Kansas, on the 3rd day of June 1825. But the evidence is satisfactory that the Otoes attacked the Kansas at their old village on the Missouri near Independence Creek—drove them from their village, and took possession. The Kansas never afterwards occupied that ground, but pitched their tents 60 or 80 miles distant on the Kansas river. The claim of the Otoes might therefor conflict with the title of the Kickapoos whose location extends north of Independence Creek. The numerous half-breeds who have a reservation on the Missouri between the Great and Little Nemohaw have at present no outlet west. To obviate further difficulties and to aid the Otoes in agriculture, I made the enclosed treaty. As the Little Nemohaw runs a northwest course, *this treaty, together with the treaty I hope to make with the Pawnees, will extinguish the Indian title to a large tract of rich land though much deficient in timber.* * * * The Otoes, are the particular and most intimate friends of the Pawnees. The civilization of the former must have a happy effect upon the latter. The Otoes have just returned from a hunt in conjunction with the Pawnees." [50] [Italics supplied.]

On October 9, 1833, Commissioner Ellsworth concluded the Pawnee treaty of that date. The Minutes of the Council had with the tribe were forwarded to Commissioner Herring in an undated letter which stated that he was enclosing the talks with the

50. By this time the Indian Claims Commission may have had occasion to examine the above letter in its consideration of the Otoe and Missouri case which has recently been heard by the Commission. This letter is listed in an official document of the National Archives, entitled "List of Documents concerning the Negotiation of Ratified Indian Treaties 1801–1869," compiled by John H. Martin, Special List No. 6, Washington, 1949, at p. 56, under item (3) in connection with the Otoe and Missouri Treaty of September 21, 1833, Treaty No. 188. This document will be hereinafter referred to as "Archives List of Treaty Documents."

Pawnee nation which preceded the treaty of cession "heretofore" transmitted to Mr. Herring. Both parties introduced in evidence photostatic copies of the record of the council and the undated letter of transmittal. The council speech of Commissioner Ellsworth began with a greeting from the Great Father to the Pawnees and the assurance that although the Osage and the Delawares lived closer to the Great Father, he loved the Pawnees just as much and believed that the Pawnees were really disposed to settle their difficulties with the other tribes. Next, he stated:

> "Yourselves and the Delaware have long been at war. You have claimed that the Delaware trespassed upon your lands. When your Great Father gave the Delawares their land he did not know that you claimed any part of it. He is very anxious to remove the difficulty and is willing to aid you in agriculture and give you goods if you will cede to him the land lying south of the Platte river. You have enough land that is good without this. Your Father will permit you during his pleasure, with other friendly Indians to hunt on the land you cede while it remains unassigned to any tribe."

He referred to the Otoe and Missouri Treaty just concluded, and suggested that in the near future the Pawnees should make peace with the Osage and the Delaware, and that when that was done there would be little danger involved in their remaining in their villages to protect the blacksmith, farmer, and teacher, whom the Government would send to them. He hoped that a peace might sometime be concluded with the Sioux. In the responsive speeches made by the Pawnee chiefs, there is indicated a willingness to give up their land south of the Platte in exchange for the annuities and the other advantages promised, and also a willingness to accompany Ellsworth on a peace mission to the Delaware and Osage Indians.

While all the above was taking place,

Commissioner Stokes was apparently in Fort Leavenworth and was unaware of exactly what Commissioner Ellsworth was doing, for on October 27, 1833, he wrote [51] to Secretary of War Cass stating that he understood Commissioner Ellsworth to be out trying to collect the Pawnees and the Comanches of the Red River in order to induce them to make peace with the other bands. Commissioner Stokes considered the trip to be a futile one because he believed both bands to be on their fall hunt or engaged in war games with the Delaware, Shawnee and Osage, and that they would not make peace in any event. He said that he considered the land west of Missouri and Arkansas unfit for white habitation, but that the Government might wish to purchase from the Pawnees a small portion of land south and east of the Platte River as a home for some of the emigrating Indians.[52]

On November 2, 1833, Commissioner Ellsworth forwarded the Pawnee Treaty of October 9 to Commissioner of Indian Affairs Herring in Washington with a letter of explanation. The letter is referred to under item (2) at page 57 (Treaty No. 190) of the National Archives List of Treaty Documents, and the original is in the treaty file of the National Archives, Senate Records. A copy appears in an incomplete journal of the Commissioners West, in the National Archives, Records of the Bureau of Indian Affairs. In pertinent part, the letter states as follows:

> "I have the honor to inform the Department of my safe return last evening to this post after an absence of two months and also to enclose a treaty made with the Pawnee nation. * * * I arrived only in time to meet the four villages of Pawnees and the Otoes before their absence on the long winter hunt. The treaty has been signed with perfect unanimity by all the tribes, and the utmost satisfaction expressed. The Indian title is hereby extinguished to a large section of country and the battle ground of the Pawnees, Delawares and

---

51. Senate Executive Document 512 (Serial No. 247), p. 623.

52. The Stokes letter was read into the transcript at page 145 by appellant's counsel.

others, may, after remaining a while a common hunting place, become the abode of much comfort to civilized tribes. The Platte river now forms a natural boundary for the Pawnee on the south. The Grand Pawnee will soon remove their village to the north side of the river; their present village being on the south bank of this stream. * * * I was received with much kindness and treated with equal hospitality. The Pawnees had long been expecting to see the Commissioners sent by their Great Father. They listened attentively to all I had to say, expressed their confidence in, and attachment to our Govt., their strong desire for peace among the red men; and their willingness to acceed to the propositions made them. The bone of contention between the Pawnees and Delawares, will now, I trust, be removed, as the land ceded by the United States to the Delawares and claimed by the Pawnees, is, with much other, embraced in this treaty. The country ceded by the Otoes and Pawnees must contain many millions of acres, as the Platte extends even to the Rocky mountains. There will be found a deficiency of timber, but many of the streams have fine bottoms covered with timber and also excellent mill sites."

The rest of the letter is devoted to comments on the desirable effect of this treaty in conjunction with the Otoe treaty of September 21, and of Commissioner Ellsworth's high hopes of making peace between the emigrant and indigenous tribes in the eastern part of the Indian territory. He tells of meeting a Pawnee Pict who was visiting the Pawnees, and of gaining much information regarding the "Mexican" Indians. He mentions the fact that the Sioux molest the Pawnees from time to time by stealing their horses.[53] He states that he has invited delegations from a number of tribes, in-

cluding the Delawares, Pawnees, Shawnees, Kansas, Ioways, Otoes, Omahas, Kickapoos, Weas, Peorias, Piankashaws, Kaskaskias, Ottoways, and Potawatomis, to come to Fort Leavenworth for a grand council of peace. The council or, as it was known, the "Grand Convention for Making Peace" commenced on November 8, 1833. A copy of the council talks appears at page 33 in the incomplete journal [54] of the Commissioners West. In addressing the tribes at the opening of the convention, Commissioner Ellsworth stated in part:

"The cause of war between some of you I will mention. The Pawnees discovered on their ground red men, strangers to them in hunting, yet claiming the land and hence made them enemies. The Delawares were their strangers and thought as the land was given them by the United States the title was good. When the United States gave the Delawares their land, they did not know that the Pawnees claimed it. I therefore went to the Pawnees and bought of them the land in dispute. The difficulty is now removed. The Delawares can now enjoy this land without fear. I have too obtained a good common hunting ground for all the red men who conduct well and preserve peace. You can now, if permitted by your great father, go with safety on the land, south of the Platte, where the Pawnees and Otoes have hitherto claimed the right to hunt alone. The Otoes have just relinquished all the land south and west of the Little Nimehaw. If peace is now made, the Pawnees will be glad to meet you on the great hunting ground as friends and brothers.

"Brothers—having made the purchase and removed the original cause of war, I invited the Pawnees, Otoes and Omahaws to accompany me to this

---

53. In his recent book on the Pawnees, George Hyde comments that instead of retaliating for such thefts, the Pawnees were likely to depart south and steal even more horses from the Osage, or from the Mexican Indians. Pawnee Indians, by George E. Hyde, University of Denver Press, 1951.

54. This journal is referred to and described in the Archives List of Treaty Documents, item 9 under treaty of December 29, 1832, with Seneca and Shawnee, p. 53.

post to establish peace with their enemies and make war no more."

A treaty of peace between certain of these tribes was signed November 12, 1833, another on November 18, and the council adjourned. On November 21, 1833, a further council [55] of peace was held between the Pawnees, Otoes and Piankeshaws prior to the signing of the articles of peace by the Piankeshaws at the Shawnee agency. In the course of that council, Commissioner Ellsworth stated, among other things:

"* * * many differences have been settled by a purchase of land from the Pawnees."

On December 4, 1833, a council of peace was held between the Pawnees, Otoes and the Osage nation. A photostatic copy of those council minutes was introduced in evidence by defendant as its Exhibit 78. Commissioner Ellsworth attempted to explain to the Osage the difference between the Pawnees of the Platte and the Pawnee Picts who resided in Mexico, and pointed out that it was the Pawnee Picts who were responsible for most of the raids on the Osage. With respect to the purchase of the common hunting ground from the Otoes and Pawnees of the Platte, Ellsworth stated:

"Let me say to the Osages that I have purchased of the Pawnees and Otoes a large hunting ground south of the Platte river, where the Osage, if peaceable, can hunt in common with other Indians during the pleasure of their great father. Here the Pawnees and Otoes will be glad to meet the Osages as friends." [56]

On December 5, 1833, Commissioner of Indian Affairs Herring wrote [57] to Mr. Ellsworth acknowledging Ellsworth's letters of November 6th and 8th and the treaties therein enclosed.[58] In this letter, Herring congratulated Ellsworth on the treaties concluded with the Pawnees, and with the Otoes and Missouris, and upon the prospect of establishing a general peace among the hostile Indian tribes. He stated that the permanent boundary lines of the Kickapoo lands could now be "speedily established."

On March 3, 1834, Commissioner Stokes wrote to Secretary of War Lewis Cass concerning the treaties negotiated by Ellsworth with the Pawnees and with the Otoes. He stated that in both treaties the boundaries were so indefinitely described that it was impossible to ascertain the amount of land contained therein, mentioning specifically the uncertain western boundary line of the Otoe cession, and the lack of any definite description in the Pawnee Treaty except for the northern boundary line formed by the Platte River. He pointed out that the cessions (both) obviously overlapped the Kansas cession made in 1825. In this connection we note that Mr. Ellsworth was aware of that overlap and mentioned it in his letter of September 23, 1833, to Commissioner Herring respecting the Otoe treaty. He apparently had the same thing in mind when he wrote to the Commissioner on November 2, 1833, with respect to the Pawnee treaty, since the Delaware Outlet was originally part of the 1825 Kansas cession. In both cases he indicated that his investigations had persuaded him that the claims of the Pawnees and the Otoes to a portion of the land included in the Kansas cession were valid and that a mistake had been made which he was correcting in the treaties with the Pawnees and the Otoes.[59] The complaint of Commissioner Stokes as to the vagueness of the descriptions contained in the Otoe and Pawnee

55. National Archives, Records of the Bureau of Indian Affairs, Incomplete Journal of the Commissioners West, p. 72.

56. National Archives, Records of the Bureau of Indian Affairs, Incomplete Journal of the Commissioners West, p. 80.

57. This letter is in evidence as defendant's exhibit 77. It appears in Senate Executive Document 512 (Serial 246), p. 837. This letter is referred to in the Archives List of Treaty Documents under No. 188,

Otoe Treaty, and No. 190, Pawnee Treaty, both of 1833.

58. The letter of November 6th, referred to infra, does not mention any enclosures. The Archives List of Treaty Documents, under Treaty No. 188 (Otoe Treaty of 1833), item 4, states that the letter of the 8th referred to in the letter of December 5th had not been found.

59. We note that in its findings of fact accompanying its opinion in the Kaw case

treaties was certainly justified, but that does not mean that Commissioner Ellsworth was not aware of the conflict and did not, after an investigation, attempt to resolve it.

The next printed official government document bearing on appellant's first and second claims, is House of Representatives Report No. 474, 23rd Congress, 1st Session 1833–1834).[60] Portions of this document were referred to by both parties, as were portions of Senate Executive Document 512, discussed hereinbefore. This House Report accompanied three bills: No. 488, to provide for the organization of the Department of Indian Affairs, finally enacted June 30, 1834, 4 Stat. 735; No. 489, to regulate trade and intercourse with the Indian tribes, and to preserve peace on the frontiers, enacted June 30, 1834, 4 Stat. 729; and No. 490, to provide for the establishment of the Western Territory, and for the security and protection of the emigrant and other Indian tribes therein. This latter bill was not enacted into law but section 30 of the so-called "Intercourse Act," above, provided "That until a western territory shall be established," the two agents for the Western Territory, as provided for in the act for the organization of the Indian Department, appointed by the President, should execute the duties of agents for such tribes as the President might direct. The passage of the Kansas-Nebraska Territory Act of 1854 effectively ended any hopes for the passage of the bill for the establishment of an Indian Territory in this area.

That portion of House Report No. 474 dealing with Bill No. 490 to establish a Western Territory is pertinent to the first two claims of appellant. At page 17 of the Report, the proposed Western Territory is described as being bounded on the north by the Platte River, on the east by Arkansas and Missouri, on the south and west by the Mexican possessions, and comprising an area of some 132,295,680 acres, of

which approximately 70,465,680 remained unassigned. A map accompanying the report (and introduced in evidence in this case as appellant's exhibit 49) shows a dotted line running north and south approximately 200 miles west of the eastern boundary of the proposed Indian Territory, and that line indicated the western boundary of what the Government considered "habitable land." At page 76 of the Report, there appears a letter from Commissioner Ellsworth to Secretary Cass, dated May 13, 1834, stating, in answer to the inquiry of Cass, that there was approximately 8,200,000 acres of *habitable* land as yet unassigned north of the Delaware land. This would include all of the Otoe and Missouri cession of 1833, and approximately half of the northern portion of the cession which appellant claims was made by it in the Pawnee Treaty of 1833 excluding the Delaware Outlet.

At page 78 of the Committee Report, there appears the report, dated February 10, 1834, of the three Commissioners West. In the course of this report, the Commissioners discuss the two cessions in the Otoe and Pawnee treaties as follows:

"The attention of the commissioners has been especially directed to the adjustment of the difficulties between the Delawares and Pawnees. The failure [of the Government] to extinguish the rights of the Pawnees and Otoes to land between the Kanzas and Platte Rivers, before assignments were made to emigrating Indians [Pawnee land was assigned to the Delawares, and Otoe land was assigned to the Kickapoo tribe], caused a bloody war among claimants, fighting on one side to defend what had never been relinquished, and, on the other, to maintain what was guaranteed by the Government. So late as last summer a whole village of the Pawnees were destroyed by the Del-

(Indian Claims Commission Dockets Nos. 33, 34, and 35, issued September 17, 1951) the Commission found that all the lands south of the Platte River within the area described in the Kaw treaty of 1825 were ceded by the Pawnees to the United States by treaty of October 9, 1833. The Commission also found that the Kaw tribe did not own or occupy any of the lands ceded in that treaty.

60. Serial No. 263.

awares, and 2,500 persons driven to the prairies without shelter.[61] Vicinity and danger had united the Pawnees and Otoes in common defense, and all south of the Kanzas River were regarded as common enemies. * * * The number of Pawnees of the Platte is estimated at 12,000 and the Otoes and Omahas on the same stream, at about 3,000.

"The commissioners, being anxious to remove the cause of war, hastened to obtain a cession of lands from the Pawnees and Otoes, to quiet the titles of emigrants who relied with confidence on the guaranty of the Government. Treaties were made with the four confederated bands of Pawnees on the Platte, and also with the Otoes, *by which the United States has acquired* several millions of acres of land; and it is fondly anticipated that the battle ground of the contending tribes will become the peaceful abode of eastern emigrants, and a civilized home for the stranger of the mountains. The river Platte now forms the north boundary of the extinguished title on the west side of the Missouri river [62] [p. 80.]" [Italics supplied.]

The report then tells of the peace treaties signed by the Pawnees, Otoes and Missouris, and Omahas with the other tribes south of the Platte; of the Commissioners' hope that the Sioux and other wild northern tribes might be induced to make peace; and finally of the problems created by the so-called Mexican Indians in the south. Table I, attached to the report, estimates the population and quantity of land then held by each of the indigenous tribes with whom the Commissioners dealt. The Pawnee population was estimated at 12,000, the Omahas at 1,400, the Poncas at 800, and the quantity of land held by the three tribes to be approximately 16,000,000 acres. The land, of course, was located north of the Platte. The Commissioners then estimated that the unassigned land north of the "country of the Delawares and Kickapoos and south of the Platte" acquired by the United States, comprised about 10,000,000 acres.

At page 93 of the report, the three Commissioners recommended the establishment of a government military post on the Platte above the Grand Pawnee Village for two purposes: (1) to protect the main route to the Rocky Mountains, and (2) for the protection of the Pawnees, Omahas and Otoes and Missouris from the wild tribes of the west. It was felt that such protection would be necessary if the Pawnees, Otoes and Omahas complied with the Government's wish that they limit their hunting and raiding expeditions and adopt a more civilized and sedentary mode of life.

In Commissioner Stokes' minority report (p. 117), he stated that the Pawnees and the Otoes and Missouris had ceded the lands "north of the Kansas country,[63] between the Great and Little Namaha, and from the waters of the Kanzas river to the south side of the Platte, and from the

61. This portion of the Report was read into the transcript by appellant's counsel at page 176.

62. Earlier in the Committee Report it was stated that a number of the tribes north of the Platte had expressed a desire to become members of the Indian confederacy, but that the committee was of the opinion that the territory south of the Platte was at that time sufficiently large and that its further extension north of the Platte should be left to future legislation. The later extinguishment of Indian title north of the Platte was not done for the purpose of extending the Indian Territory but rather to acquire land to establish military posts and later to acquire land for white settlement. This will be discussed in connection with claims 3 and 4.

63. Stokes apparently shared Ellsworth's opinion that much of the land in the Kansas cession of 1825 actually belonged to the Pawnees; specifically, that land north of the northern boundary of the Kansas Reservation defined in that treaty and surveyed by Isaac McCoy. By the "source" of the Platte, Stokes probably meant the point where the North and South Forks meet to form the Platte proper, and this confirms the boundary west claimed by appellant.

Otoes and Missouri Reservation west to its [the Platte's] source."

Although the material we have summarized in the preceding pages is extensive, we do not think it constitutes all the material which might and should be examined in connection with appellant's first two claims. There may well be valuable information which will cast further light on the character and extent of appellant's occupancy and use of land south of the Platte in the correspondence of General William Clark and in the field notes of the surveys made by Isaac McCoy, both in the possession of the Kansas Historical Society in Topeka, Kansas.

Contrary to the Commission's findings, it is clear that the Pawnee claim to the Delaware Outlet land was called to the Government's attention as early as 1830 by Mr. McCoy. The claim was, upon the order of the Secretary of War, investigated by government agents and specific recommendations for its disposition were made. The Commissioners who were appointed under the Act of July 14, 1832, were given specific instructions to investigate the Pawnee claim to the Delaware Outlet and to give great weight to the investigations and reports of Isaac McCoy, John Dougherty and General William Clark. An account of the investigation made by the Commissioners West and the conclusions reached by them with respect to the Pawnee claim to the Delaware Outlet land and the extent of land controlled by the Pawnees south of the Platte, is to be found in Senate Executive Document 512 and House Report 474, excerpts from both of which documents were placed in evidence before the Indian Claims Commission. An examination of these documents in their entirety, along with related documents referred to above, such as the Ellsworth letters forwarding the Pawnee and Otoe treaties to Washington, may assist the Commission in determining the boundaries of the area intended by Ellsworth and the Pawnees to be embraced in the 1833 treaty. We note, in passing, that none of the material examined indicates that the Pawnees ever exclusively oc-cupied as a hunting ground, or made any serious claim to, land south of the northern boundary of the 1825 Kansas Reservation. That area comprises approximately one-half of the area claimed by appellant in claim 2, and, as noted by the Indian Claims Commission, it was roamed over by numerous tribes (Osage, Kansas, Comanches, Wichitas) with no one tribe in control.

The northern boundary is stated in the 1833 treaty to be the Platte River in Nebraska. Appellant has indicated that it is willing to accept the line established by the Treaty of Fort Laramie of September 17, 1851, 11 Stat. 749, as the western boundary, although that line is somewhat east of the boundary indicated in the above mentioned documents, i. e., the Mexican possessions which later became the State of Colorado. As indicated above, the southern boundary was considerably north of the southern boundary claimed by appellants, i. e., the Arkansas River, and, on the contrary, may have been the northern boundary line of the Kansas Reservation established by the Treaty of 1825 and surveyed by Isaac McCoy at about the same time he surveyed the Delaware Outlet in 1830.

With respect to the eastern boundary of the Pawnee cession of 1833, we note that since the hearing in the instant case, the Indian Claims Commission has completed hearings in the Otoe case involving the land claimed to have been owned and ceded by the Otoes to the Government in 1833. The western boundary of the Otoe cession was indefinitely described in the Otoe Treaty. Commissioner Ellsworth knew that the Otoes and Pawnees were traditionally on very friendly terms and did much of their hunting together. Their lands south of the Platte adjoined, and as early as the Lewis and Clark Expedition, it was reported that the large and powerful Pawnee bands were on friendly terms with the small Otoe and Missouri tribes. On the basis of the material investigated in the Otoe case, the Commission may be able to determine the dividing line between the Otoe and Pawnee lands ceded in 1833.

The resulting area which will be determined may, we believe, comprise substantially the area shown by Royce on his Kansas I map in the 18th Annual Report of the Bureau of American Ethnology (Part II), except that it would include, in addition to the area shown by Royce to have been ceded by the Pawnees, a triangular area including a portion of the Delaware Outlet and the adjoining land directly north thereof.

In view of the vast amount of material contained in official government documents and correspondence which was not called to the Commission's attention and which we believe is an indispensable part of the record in this case, we think the Congressional intent that these claims shall be *finally* settled on the fullest possible record, will best be served by setting aside the Commission's findings and determinations and remanding claims 1 and 2 to the Commission for further consideration, the making of new findings of fact respecting the pertinent issues, and for whatever further proceedings the Commission and the parties may deem necessary.[64]

In further considering the first claim relating to the taking by the United States of Pawnee land for the benefit of the Delaware Indians in 1829, the Commission should bear in mind that the cession of October 9, 1833, was intended to include such land. The circumstances surrounding the negotiation and execution of the 1833 treaty might be held to show an intention on the part of the Pawnees to consider the making of the treaty as curing the 1829 taking. If this is so, then claims 1 and 2 might properly be taken as one claim arising under the 1833 treaty and section 2(3) of the Indian Claims Commission Act. If it is decided that the 1833 treaty did not cure the taking, or that there was a temporary taking for the period from 1829 when the land was assigned to the Delawares, to 1833 when the Government purchased that land along with other lands

adjacent thereto, the fact and amount of payment in 1833 may be relevant in determining the amount of the award.

## Claims 3 and 4

Claims 3 and 4 are urged under Section 2(3) of the Indian Claims Commission Act. Appellant alleged, in effect, that pursuant to ratified treaties of cession in 1848 and 1857, quantities of land, ascertainable from the descriptions in the treaties, were ceded to the United States for considerations so much lower than the actual value of the land at the times of cession, that the considerations were unconscionable.

The Commission concluded that there was nothing in the treaties themselves nor in the circumstances surrounding their negotiation and execution which indicated acknowledgment or recognition by the United States of Indian title in the Pawnees to any part of the lands described and ceded, and that at the times the treaties were concluded the Pawnees did not actually occupy, possess, and use, to the exclusion of other tribes, any of the lands ceded.

## Claim 3

Findings of fact 9, 10, and 11 relate to the Treaty of August 6, 1848, 9 Stat. 949. Together with additional facts alluded to in the Commission's opinion, the facts which the Commission considered pertinent as a basis for its conclusions will be summarized.

Following the 1833 Treaty, whereby the Pawnees ceded all of their land south of the Platte River, a number of Pawnees continued to reside in their old villages on the south side of the River and by 1847 their presence constituted a nuisance, and occasionally a menace, to white emigrant trains passing through this area on their way to Oregon. Because of this situation, Lt. Col. Ludwell E. Powell, Commander of the Battalion of Missouri Volunteers, was ordered to visit the Pawnees on his way west and to compel their removal north

64. Section 20 of the Indian Claims Commission Act provides, among other things, that this court may "at any time remand the cause to the Commission for such further proceedings as it may direct".

of the Platte. The Commission states in its opinion that Powell was also charged with the duty of establishing military posts along the route to Oregon for the protection of white emigrants and for the maintenance of peace among the Indian tribes along the route, and that although it was apparent that Powell concluded the 1848 Treaty in furtherance of that duty, his special duty was to compel the removal of all the Pawnees north of the Platte. In arriving at this conclusion the Commission was apparently impressed with a series of exhibits consisting of photostats of letters between Powell, the Adjutant General's Office, the Indian Office, and the Pawnee Agent, regarding the necessity of removing the Pawnees north of the Platte, and the wisdom of postponing the move from May to August 1848 in order to enable the Pawnees to harvest the crops they had planted. Unless the postponement was allowed, the Pawnees would starve in the fall, or the United States would have to feed them. The removal was postponed. The Commission found that the treaty was concluded in August and transmitted to the Adjutant General on August 10, 1848, without comment, and that the letter of December 11, 1848, from the Commissioner of Indian Affairs, forwarding the treaty to the Secretary of War, merely stated that it was a cession by the Pawnees of a strip of land on the north side of the Platte River for military purposes connected with the establishment of the first post on the route to Oregon in advance of the frontier.

The material specifically called to the attention of the Commission by the parties indicates little more than the facts above stated. The treaty itself recites that the Pawnees cede and relinquish to the United States "all their right, title, and interest in and to all that tract of land described as follows, viz.: Commencing on the south side of the Platte River, five miles west of this post, 'Fort Childs;' thence due north to the crest of the bluffs north of said Platte River; thence east and along the crest of said bluffs to the termination of Grand Island, supposed to be about sixty miles distant; thence south to the southern shore of said Platte River; and thence

west and along the southern shore of the said Platte River to the place of beginning.

"The land hereby conveyed is designated within the red lines of the following plat. * * * "

There followed in the treaty, a map of the area ceded and a note stating that the red lines in the original plat were designated by dotted lines in the copy. Latitude was given as 40°33' and longitude as 99° "nearly." It is difficult to see how the treaty containing the above language and description of the land ceded, along with the facts recited by the Commission, can justify the conclusions (1) that the treaty and the circumstances surrounding its negotiation and execution indicated that the Government did not intend to recognize and acknowledge Indian title in the Pawnees to the land described, and (2) that the Pawnees did not own to the exclusion of other Indians such land.

In addition to the material which was presented to the Commission by the parties, there exists a considerable amount of documentary matter of which the Commission might have taken notice and which we think was vital to a proper evaluation and determination of this claim. We think that this material, together with the material actually considered by the Commission, casts doubt upon the Commission's conclusion that the Pawnees owned none of the lands described in the treaty of cession of 1848.

As early as 1834, the Government was considering the advisability of establishing a military post on the Platte River in the vicinity of the Grand Pawnee village, as revealed in House of Representatives Report No. 474, discussed in connection with claims 1 and 2. In that report it was stated that such a post would be necessary to protect one of the main routes to the Rocky Mountains, and to protect the Pawnees, Omahas, Otoes and Missouris, located in that vicinity "who have manifested desire to give up their erratic habits and settle down permanently and follow agricultural pursuits" (p. 93). In 1842, the Indian Agent at Council Bluffs (responsible for the Pawnees, Otoes, Missouris, and Oma-

has) wrote [65] to the Superintendent of Indian Affairs at St. Louis stating, among other things, that those Pawnees who had continued to live on the land south of the Platte ceded to the government in 1833, had moved to new homes on the Loup Fork of the Platte; and that although some of the older members of the tribe were inclined to remain at their old villages south of the Platte, they would soon move since their chiefs had requested that their future annuity payments be made at their new homes. In 1843, Samuel Allis, Superintendent of Schools for the Pawnees, wrote [66] to the Commissioner of Indian Affairs stating that the Sioux were continually annoying the Pawnees and that unless the Government gave some sort of military help to the Pawnees they would be unable to continue remaining in their villages north of the Platte and protecting the various government employees (teachers, blacksmiths, farmers) residing therein. Apparently the new locations north of the Platte were not as easy to defend from attacks of other Indians as their old villages south of the Platte. In the same year the agent for the Pawnees, Omahas, etc., Daniel Miller, wrote [67] to the Superintendent of Indian Affairs at St. Louis stating that the Omahas claimed a country bounded by the Missouri on the east, by the Platte on the south, and by the Pawnee country on the west; that the Pawnees claimed a country bounded on the south by the Platte River, by Shell Creek on the east, and by undefined limits on the north and west. He also noted that in June of 1843 the Sioux nearly destroyed the new village which had been built north of the Platte by the Grand Pawnee, Republican, and Tappage bands, and stated:

"Our border Indians frequently complain that their father will not permit them to retaliate. As it is, the Sioux seem to be waging a war with apparent impunity, and as there has been no formidable retaliation for some years, it gives the Sioux fresh confidence, and makes them the more fierce [p. 403]."

As a result of the Sioux attacks on the villages north of the Platte, the few Pawnees who had remained south of the river refused to move north and many of those who had moved returned.

In 1845, Thomas Harvey, Superintendent of Indian Affairs in St. Louis, wrote to T. Hartley Crawford, Commissioner of Indian Affairs in Washington,[68] stating that of the Indians in the St. Louis superintendency, the Pawnees were the most susceptible of rapid improvement; that they were most anxious to adopt the white man's habits and readily gave up their children to the whites to be educated; that because of their "exposed location" they were subject to attacks from the Sioux. He then discussed the problem arising because of the passage of the emigrant trains for Oregon across Indian country, as follows:

"For the safety of the emigrants and the tranquility of the Indians, I would suggest that a right of way through such sections of country as may be deemed most convenient for laying out roads to Oregon be purchased of the Indian tribes owning the country. This was done with the Osages and Kanzas, when laying out the road to Santa Fe * * *. With a view to carrying the foregoing into effect, I would respectfully recommend the establishment of the following roads or routes, viz: one to cross the Missouri river at St. Joseph's which would pass through the Kickapoo, Iowa, and Sac and Fox countries; another to cross the same river at the Council Bluffs, and passing

65. U. S. Senate, 27th Cong., 3rd Sess., 1842–1843, Senate Executive Document No. 1, Report of the Secretary of War, letter dated September 3, 1842, pp. 439–440 (Serial No. 413).

66. U. S. Senate, 28th Cong., 1st Sess., 1843–1844, Senate Executive Document

No. 1, Annual Report of the Secretary of War, pp. 312–313 (Serial No. 431).

67. Id., pp. 398–404.

68. U. S. Senate, 29th Cong. 1st Sess., 1845–1846, Senate Executive Document No. 1, Report of the Commissioner of Indian Affairs, beginning at page 531 (Serial No. 470).

through the Pottawatomie, Ottoe, and Pawnee lands * * * [p. 536]."

On May 19, 1846, Congress passed an Act to provide for "raising a Regiment of mounted Riflemen, and for establishing military Stations on the Route to Oregon." 9 Stat. 13. Section 6 of the Act provided, as follows:

"That a sum not exceeding three thousand dollars, out of any moneys in the treasury not otherwise appropriated, be, and the same hereby is, appropriated, to defray the expenses of each military station or defence which the President may deem necessary on the line of communication with Oregon, *and a sum not exceeding two thousand dollars for making compensation to the Indian tribes which may own or possess the ground on which the said station may be erected, and for each station.*" [Italics supplied.]

National Archives Special List No. 6, List of Treaty Documents concerning the negotiation of ratified Indian treaties from 1801 to 1869, referred to hereinbefore, directs our attention to Record Group 94, Records of the Office of the Adjutant General, for documents germane to the 1848 treaty, and specifically for the letter of instructions to Col. Powell who was authorized to negotiate for the 1848 treaty with the Pawnees.

On June 1, 1847, the Secretary of War, W. L. Marcy, gave an order in the form of a letter [69] to the Adjutant General, Brig. Gen. Jones, relative to plans for the establishment of two new military posts in accordance with the provisions of the Act of May 19, 1846. The Secretary of War stated that the first post should be established near Grand Island, Nebraska, and the second post at or near a trading post known as Fort Laramie. He stated that a requisition had been made upon the State of Missouri for one battalion of mounted

volunteers to carry out the mission. The letter provided for the appointment of a commanding officer for the battalion, an engineer officer, and an officer from the Quartermaster Corps. The letter then continues:

"The act referred to appropriates a sum, not exceeding two thousand dollars, for the purchase, from the Indian tribes, of each of the sites to be selected for military posts. This money will be disbursed by the Assistant Quarter Master, under the direction of the Commanding Officer, who is authorized to enter into a treaty with the Indians for the purchase of the ground for these sites, which will be as extensive as the appropriation will procure.

*    *    *    *    *    *

"These instructions will be communicated to the commanding officer of the troops, and to the several Chiefs of Staff Departments for their information and government."

On June 3, 1847, the Adjutant General forwarded a copy of the above letter of instructions to the "Commander of the Missouri Mounted Battalion," with a covering letter [70] addressed to that officer. It appears that as of that date no particular officer had been appointed commander of the battalion, and accordingly, the Adjutant General wrote [71] to Lt. Col. Wharton of the 1st Dragoons, Fort Leavenworth, sending to him copies of both letters and stating that as yet he did not know who would be appointed Commander of the Missouri Mounted Battalion. In his letter of June 3, 1847, the Adjutant General advised the Commander of the Missouri Mounted Battalion, that he was to be strictly governed by the enclosed instructions as set forth in the Secretary of War's letter of June 1.

On June 15, 1847, the Commissioner of Indian Affairs wrote [72] to Secretary of War

69. National Archives (RG 107), Records of the Office of the Secretary of War, Letters Sent, Vol. 27, pp. 356–357.

70. National Archives (RG 94), Records of the Office of the Adjutant General, Letters Sent, Vol. 24, p. 28.

71. Op. cit., p. 28.

72. National Archives (RG 75), Records of the Bureau of Indian Affairs, Letters Sent, Report Books, Vol. 5, pp. 261–262. The enclosed letter from the Commissioner of Indian Affairs was introduced

Marcy, enclosing letters from Superintendent of Indian Affairs Harvey to the Commissioner, and from the Pawnee white farmer McElroy to the Pawnee Agent, John Miller. These letters dealt with the various problems created by the presence of the Pawnees on the south side of the Platte River. The Commissioner of Indian Affairs urged that the Army take drastic and immediate measures to move those Pawnees who had remained in their old villages south of the Platte on land ceded to the United States in 1833, to locations on the north side of the river.

As a result of the Indian Commissioner's request, the Adjutant General, on June 16, 1847, sent copies of all the above correspondence to Lt. Col. Wharton at Fort Leavenworth and to the "Commanding Officer of Battalion of Missouri Mounted Volunteers".[73] He directed the Commander to visit the Pawnee country and compel those Pawnees still residing south of the Platte to remove at once north. The Commander was also told to investigate the outrages supposedly committed by the Pawnees, and to identify, if possible, the particular Indians who committed them and take them into custody.

On June 17, 1847, Indian Commissioner Medill again wrote [74] to the Adjutant General urging that troops be sent to move the Pawnees north of the Platte, and suggesting that the Commanding Officer of the Missouri Battalion consult with Superintendent Harvey at St. Louis regarding the details of the removal. On October 23, 1847, the Adjutant General wrote [75] to Lt. Col. Wharton at Fort Leavenworth, enclosing a copy of a letter from the Commissioner of Indian Affairs, dated October 20, 1847, relative to an attack by the Sioux and

Otoes on whites, and the necessity for punishing the "murderers." The Indian Commissioner wrote of the advisability of establishing a military post somewhere between the Missouri River and the Platte River "Where it is stated there are many excellent sites." The Adjutant General asked Col. Wharton to study the suggestions made in the letter and communicate his views to the Adjutant General. On December 27, 1847, the Adjutant General again wrote [76] to Lt. Col. Wharton sending him a copy of a report from Superintendent Harvey regarding the attacks of the Sioux on the Pawnees and suggesting the wisdom of establishing a military post in the vicinity for the protection of the Pawnees and other weak tribes.

On January 24, 1848, Lt. Col. Powell, who had been appointed Commander of the Battalion of Missouri Mounted Volunteers, wrote [77] to the Secretary of War. In this letter Powell referred first to the Secretary's letter of June 1, 1847, to the Adjutant General containing instructions relative to the purchase of a site for a military post from the Indian owners for the sum of $2,000 pursuant to the Act of May 19, 1846, and authorizing the Commanding Officer to enter into a treaty for such purchase, "the site to be as extensive as the appropriation will procure." Lt. Col. Powell then made the following suggestion:

"From the knowledge I have of the character of the tribes with whom I have to treat, I feel assured that with 500 dollars in goods judiciously selected, I can procure more territory than with the 2,000 dollars. I am induced thus to believe, from the fact that I have seen them, when an ounce of vermillion, or beads of assorted colors

in evidence as defendant's Exhibit No. 23.

73. National Archives (RG 94), Records of the office of the Adjutant General, Letters Sent, Vol. 24, p. 44. The letter to the "Commander" appears in evidence as defendant's Exhibit No. 22.

74. National Archives (RG 75), Records of the Bureau of Indian Affairs, Letters Sent, Vol. 39, pp. 421–422.

75. National Archives (RG 94), Records of the Office of the Adjutant General, Letters Sent, Vol. 24, p. 253.

76. Op. cit., p. 360.

77. National Archives (RG 94), Records of the Office of the Adjutant General, Letters Received, 41P–1848. This letter was apparently sent to the Adjutant General for transmission, if contents approved, to the Secretary of War.

was presented in one hand, and a ten dollar gold piece in the other, they uniformly chose the former."

On the back of Powell's letter, the Adjutant General made a notation that Powell's suggestion seemed "worthy of note," and, so marked, Jones submitted the letter to the Secretary of War.

There next appears a group of letters, introduced in evidence by appellant as Exhibit 25, dated May 6, 1848, May 9, 1848, and May 13, 1848, all relating to the wisdom of postponing the removal of the Pawnees north of the Platte until the end of summer when their crop had been harvested. We are unable to see what this matter had to do with the 1848 treaty of cession. It is true that Col. Powell was instructed to carry out the removal, but there is no indication that this had any connection with the purchase, by treaty, of a site for the establishment of a military post on the route to Oregon. Indeed, these communications, especially those from Commissioner of Indian Affairs Medill, indicate that he had no notice at all of the proposed treaty with the Pawnees for the cession of lands to be used for military reservations, since he recommended on the back of one of the letters that it would not be advisable to remove the Pawnees unless there was military force stationed somewhere in the vicinity of the junction of the Platte and Missouri rivers to protect them. By this time, as we shall see, Powell had already held a council with the Pawnees and discussed with them the prospect of purchasing land in the vicinity of Grand Island for a military post.

On July 3, 1848, Thomas H. Harvey, Superintendent of Indian Affairs at St. Louis, wrote [78] to the Commissioner of Indian Affairs Medill, in Washington, forwarding therewith a letter,[79] dated June 17, 1848, from Pawnee Agent Miller to Mr. Harvey. This letter appears to be the first notice the Indian Office in Washington had of the Government's intention to negotiate a treaty of cession with the Pawnees. The letter is as follows:

"I suppose it is my duty to advise you of a treaty that took place on the 29th of May last between Lt. Col. Powell, Commandant of the Oregon Bat. in behalf of the U. S. of one part, and the chiefs of the Pawnee tribes of Indians of the other. I was with them by request of the Col. I confess that I felt myself placed in an awkward situation from the fact that I did suppose if the Government wished their agent to have any agency in their treaty, that he would have been advised of the fact and had some instructions on the subject. In the absence of any knowledge of whether it was any part - of my duty without having at least been notified by the Department of any thing of the kind being on hand. The fact of Col. Powell communicating to me any knowledge of him going to make a treaty with the Indians was rather as a compliment and to get the Government interpreter's assistance. Had the Department notified the agent that he would attend the treaty, etc., he would have felt no hesitancy in the matter, but he could not have given his consent to it in the shape it was agreed on unless he could have been on the ground or at least had a more definite knowledge of the quantity and value of the land. Two thousand dollars may be more than it is worth (that being the amount which the Government gave the Col. for that purpose) and again, the quantity of land given may be worth *ten times* that sum. I think the treaty too vague and indefinite. We are to have the whole length of the Island which, according to Col. Freemont's map is fifty-two miles in length and we are to have as far back as the Bluffs, which I have been informed is from ten to fifteen miles in width. Had I felt that I was responsible for anything of this treaty

78. National Archives (RG 75), Records of the Bureau of Indian Affairs, Letters Received—Council Bluffs, 1848, H758.

79. National Archives (RG 75), Records of the Bureau of Indians Affairs, Letters Received—Council Bluffs, 1848, H758 (encl.).

(except advising a change from money to such articles as you see they are to get, which I did from a conviction that they did not know the value of money and that a few sharpers would get it for almost nothing) I undoubtedly should have contended for a site of the land and more definitely determined the quantity. The Indians said in the treaty that *it was their choice ground, but as their Great Father wanted the land, they would let him have it, but remarked that they did not want to give the Wood river, as it was a place that they would like to live on sometime.* That they know not the value of money I will give you one instance when the Pawnees came in here after corn, one Indian sold his robe for four dollars, as he supposed and immediately went to the trader here and called for a four dollar blanket stating that he had the money. The trader handed him the blanket and the Indian handed him his four dollars as he thought, but behold, it was only four twenty cent pieces and it was with some difficulty that he could be persuaded that such was the fact. Thus, you see that a few papers of red paint could take their two thousand dollars.

"As the Government only wished to give two Thousand dollars, I would most respectfully ask as their agent that Commissioners be appointed to select the full value of their two thousand dollars in land, and at the place where it would best suit the Government purpose for the erection of a fort and to mark out the boundaries of the land so selected and establish the corners of the same. The interpreter is of the opinion that when the Indians see the amount of land marked out which they have sold, that it will look so much larger than they contemplated that they will be dissatisfied as they know nothing about the length of a mile. In making the above request I wish to cast no reflection on Col. Powell or anyone concerned. I would think the Government could appoint no better gentleman than the Col. When he has the opportunity of seeing and examining the land in person, I doubt whether they would have parted with the land at all only as their Great Father wanted it. They said he should have it. I would dislike very much if the Indians should be dissatisfied. If you think this superfluous, ascribe it to my sincere desire to keep and cultivate peace wherever it can be done consistent with justice."

The following receipt was appended to Miller's letter:

Grand Island and the land on the north side as far back as the Bluffs sold May 29, 1848, by the Pawnee Indians to Col. Powell, U. S. Agent, for—

(Treaty):

| 150 | guns |
| 20 | kegs powder   25 pounds each |
| 250 | lbs lead |
| 30 | blankets |
| 150 | knives |
| 500 | flints |
| 160 | pounds tobacco |

Treaty to be signed when the goods are delivered.

The above letter and attached receipt are listed in the National Archives List of Treaty Documents as item 2 under the 1848 treaty.

On July 15, 1848, Commissioner of Indian Affairs Medill wrote [80] to Superintendent Harvey at St. Louis, as follows:

"I have received your letter of the 3rd instant, forwarding one to you from Agent Miller, in relation to a treaty stated by him to have been made by Lt. Col. Powell of the Oregon Battalion with the Pawnee Indians for a part of Grand Island of the Platte, with a memorandum of articles proposed to be given as the consideration.

*"Your letter conveys the only information received at this office that*

---

80. National Archives (RG 75), Records of the Bureau of Indian Affairs, Letters Sent, Vol. 41, p. 102.

*a treaty has been made. The measure has been effected without conference with the Bureau or any intimation given it, that anything of the kind was in contemplation. I have therefore no instructions to give or information to communicate."* [Italics supplied.]

The above letter is listed as item (3) in the Archives Treaty Document list.

On August 10, 1848, Lt. Col. Powell transmitted the treaty to Adjutant General Jones with a letter [81] which merely stated that he was transmitting the treaty concluded by him with the Four Confederated Bands of Pawnee on the 6th of August. On December 11, 1848, Commissioner of Indian Affairs Medill transmitted the treaty to Secretary of War Marcy with only a formal statement of transmittal.[82]

From the above it appears that Lt. Col. Powell in 1847 received two sets of instructions; one set of instructions directed him to purchase of the Pawnees as much land as he could for $2,000 for use as a military site, pursuant to the Act of May 19, 1846. Neither these instructions nor the later correspondence relating to the making of the treaty were called to the Commission's attention. The other set of instructions had to do with the removal to the north of those Pawnees who had remained in their villages south of the Platte, and they were issued as a result of the request of the Commissioner of Indian Affairs. Most of this latter material was called to the attention of the Indian Claims Commission by exhibits offered in evidence by both parties.

For the reasons set forth in connection with claims 1 and 2, we shall set aside the findings and determination of the Commission and remand this claim to the Indian Claims Commission for further consideration, the making of new findings of fact respecting the pertinent issues, and for whatever further proceedings the Commission and the parties may deem necessary.

### Fourth Claim

In its findings of fact (11, 12, and 13) and in its opinion, the Commission summarized the record before it with respect to the Pawnee Treaty of September 24, 1857, 11 Stat. 729, and concluded that at the time the treaty was executed, and for a number of years prior thereto, the only land occupied and possessed by the Pawnees was a comparatively small, undefined area along the Platte and Loup rivers in the eastern part of the land described in the treaty of cession, whereas the balance of the ceded area was traversed and hunted upon by other tribes with no one tribe having exclusive possession. The Commission further concluded that the circumstances surrounding the negotiations and execution of the treaty indicated that the United States did not recognize or intend to recognize or acknowledge the exclusive use and occupancy, right or title of the Pawnees in any of the land ceded other than the land contained in the area reserved for their exclusive use in that treaty. The facts upon which the Commission relied in reaching these conclusions will be summarized.

In 1851, some of the Pawnees were still residing south of the Platte River on land ceded to the United States in 1833. The Pawnees living in the Loup River area had been compelled to move their villages east because of attacks by the Sioux. Because of the conflict between the Pawnees and the white settlers who were moving into eastern Nebraska, the Pawnees informed their agent, William Dennison, that they would like to end their difficulties by making a treaty with the Government. Dennison reported the Pawnees to be reduced in number to about 4,000, and to be in a state bordering on starvation from lack of food and ammunition to hunt game.

81. This letter is item (5) in the Archives Treaty Document List and was introduced in evidence as defendant's exhibit 75.

82. Archives Treaty Document List, item (6), and defendant's exhibit 76. Claimant's exhibit 25 contains two letters dated August 22 and September 11, 1848, concerning the taking into custody by Powell of a Pawnee Chief and his subsequent release upon the order of the Adjutant General. Neither letter has any bearing on the treaty of August 6, 1848.

In May 1857, the Commissioner of Indian Affairs advised the Secretary of Interior of the condition of the Pawnees and called his attention to previous reports of the Commissioner of Indian Affairs in 1854, 1855, and 1856 recommending a treaty with the Pawnees as the best way to establish them in a fixed and permanent home, and suggested that negotiations be entered into with the Pawnees for the extinguishment of their title to the country north of the Platte and the establishment of the Pawnees in a permanent home. The Indian Claims Commission noted that on August 15, 1857, Indian Affairs Commissioner Denver was appointed as treaty commissioner "to enter into negotiations with the Indian tribes west of the States of Missouri and Iowa for the purpose of securing the assent of said tribes to the settlement of the citizens of the United States upon the lands claimed by said Indians, and for the purpose of extinguishing the title of said tribes in whole or in part, to said lands."

The Commission next notes that the Treaty of September 24, 1857 was entered into at Table Creek, Nebraska, and states that *there is no record of the 1857 treaty negotiations.* The Commission then makes the following comment:

"It is evident that Commissioner Denver was following the established policy of the government at that time of acquiring Indian title in not only land actually owned by the Indians but in all territory claimed by them as well. *There is no evidence that Commissioner Denver had any knowledge of, or that he made any investigation to ascertain* the extent of the actual occupancy or rights of the Pawnees in the land included in the cession of 1857." [Italics supplied.]

The Indian Claims Commission notes that the treaty was ratified by the Senate with an amendment concerning the right of the President to discontinue the perpetuity provided for in the treaty, and that this amendment was approved by the Pawnees in April 1858.

It is interesting to note that defendant introduced in evidence photostats of every document concerning the 1857 treaty listed in the National Archives List of Treaty Documents, except one. The document omitted was a letter, dated November 9, 1857, from Commissioner of Indian Affairs Denver (who negotiated the treaty) to the Secretary of Interior. That letter, which is the most informative document on the treaty referred to in the list, was printed, along with other treaty documents, for the use of the Senate, and appears in Vol. 50, Regular, Confidential Documents, U. S. Senate, 35th Congress, 1857–1859. A set of these volumes is in the possession of the Executive Clerk of the Senate. Printed copies of this letter and the other treaty documents are in the Senate Records in the National Archives. This letter, which will be set forth in pertinent part hereinafter, indicates that Commissioner Denver *did* make an investigation of the extent of Pawnee occupancy of the land north of the Platte, as well as an investigation of the extent of the actual occupancy of the Poncas and Omahas.

Prior to 1849, Indian affairs were managed by the War Department. Subsequent to that time Indian affairs were transferred to the Department of the Interior and much information concerning the Government's relations with the tribes may be found in the annual reports of the Secretary of the Interior. These reports contain the annual report of the Commissioner of Indian Affairs, and reports from various agents and subagents throughout the country. In 1849, in the annual report of the Secretary,[83] there appears a letter from the Council Bluffs Subagency, dated October 1, 1849, recommending the purchase by the Government of some of the Pawnee land north of the Platte River. The report points out that the Pawnees were on their usual friendly terms with the Otoes and Omahas, but that except for

83. U. S. Senate, 31st Cong., 1st Sess., 1849–1850, Senate Executive Document No. 1, p. 1076 (Serial No. 551).

the Comanches, they were "at variance with the red men of the whole western territory." In 1850 the Council Bluffs Subagency reported [84] that the tide of white emigration to the west was "pouring into and through the very midst of their [Pawnees, Otoes, and Omahas] corn fields, their villages and their hunting grounds" and stated that either the emigration by that route must be stopped or money must be given to the tribes for their support, since not only were their crops destroyed, but the game was being driven off and their general condition was becoming deplorable.

In 1851, the Council Bluffs Indian Agent reported [85] that the Otoes and Missouris, the Omahas and the Pawnees, were without annuities and were anxious to sell some of their lands. He suggested that all the lands inhabited by Otoes and Missouris and the Omahas

"extending from the mouth of the Big Nemahaw up the Missouri, about two hundred and fifty miles, can be purchased for a small annual payment in cash or goods. By the addition of a part of the Pawnee lands a territory could be formed which, for agricultural purposes, would rival any of the rich lands of Missouri and Iowa. Coal has already been obtained on the Missouri, and I am satisfied abundant supplies can be had on that stream to say nothing of the mines which can be found on the river Nebraska or Platte."

He pointed out that because of the expiration of the Pawnee treaty of 1833, the tribe was without blacksmiths and school teachers and the Indians were in a deplorable condition.

Section 2 of the Indian Department Appropriation Act of March 3, 1853, 10 Stat. 226, 238, provided that the President was authorized to enter into negotiations with the Indian tribes west of the States of Missouri and Iowa for the purpose of "securing the assent of said tribes to the settlement of the citizens of the United States upon the lands claimed by said Indians, and for the purpose of extinguishing the title of said Indian tribes in whole or in part to said lands". Pursuant to that Act, the President designated the Commissioner of Indian Affairs (Mr. Manypenny) to conduct the necessary negotiations, and that officer shortly thereafter made a visit to the Indian country "to explore it, and to obtain such information as would be useful and necessary, in preparing full and detailed instructions as to the terms and conditions of the treaties to be negotiated" [86] (p. 249). On this visit, Commissioner Manypenny visited all the tribes located immediately west of the Missouri except the Quapaws, Senecas and Shawnees. He remarked that he had not had time to visit the Pawnees, Kansas or Osage Indians "with whom, although their lands are not contiguous to the boundaries of either of these States, it is desirable that treaties also be made, should a civil government be established and the country opened for settlement." This latter reference was apparently to the Kansas-Nebraska Act which was passed the following year, 10 Stat. 277. He reported that the Indians were generally opposed to selling their lands unless they could retain tribal reservations on those lands. It was the Commissioner's view that such an arrangement would not be desirable and that the border Indians should be removed from the country altogether. He stated that in his opinion the Government's original plan for the emigrant tribes had proved a failure partly because the acquisition of Texas, New Mexico, and the Pacific possessions had brought about vast emigrations which passed through the Indian country at many points. At page 345 of the same volume of Executive Documents, the Council Bluffs Indian Agent reported on the condition of the Omahas, the Otoes and Missouris and

---

84. U. S. Senate, 31st Cong., 2d Sess., 1850–1851, Senate Executive Document No. 1, p. 71 (Serial No. 587).

85. U. S. Senate, 32d Cong., 1st Sess., 1851–1852, Senate Executive Document No. 1, p. 356 (Serial No. 613).

86. U. S. Senate, 33d Cong., 1st Sess., 1853–1854, Senate Executive Document No. 1, Report of the Commissioner of Indian Affairs, November 26, 1853, pp. 243–264 (Serial No. 690).

the Pawnees. His report indicated that the boundaries of their lands were fairly definite and known to the Government. He reviewed at some length the plight of the Pawnees and concluded that the treatment they had received from the Government left much to be desired.

House of Representatives Indian Affairs Committee Report No. 133 to H.R. 210 (33d Cong., 1st Sess., Report of Committees, House of Representatives) [87] considered the terms on which treaties should be made with certain tribes of Indians as well as other matters. At page 2 the report states:

> "The acquisition and settlement of California and Oregon has created the necessity of converting much of the Indian wilderness into a great highway and thoroughfare. Not less than seventy-five thousand of our citizens annually traverse the Indian country on their journeyings to and from the Pacific coast."

At page 10 of the report there appears a table prepared by the Indian Office showing the different tribes affected by the bill, the country from which they came if emigrants, their population, the quantity of land held by each, the title by which held, i. e., whether by treaty guarantee, as was the case of the emigrant tribes who had accepted grants of land in Kansas and Nebraska from the Government, or by "Indian title" in the case of the indigenous tribes; the dates of the treaties (under a heading entitled "remarks"), and the amount of each tribe's current annuities, if any. The table also showed the approximate share of land allocable to each Indian based on the acreage owned by the tribe and the tribe's total population.

With respect to the Pawnees, the table showed a population of 4,500 Indians owning 12,800,000 acres of land, with 2,844 acres per Indian,[88] the land being held by "Indian title." The boundaries of the land held by the Pawnees in 1854 were given simply as "North [89] by Platte, east by Omahas."

The Omahas are shown as having a population of 1,300 Indians owning 4,480,000 acres of land, with 4,148 acres per Indian, held by Indian title. The boundaries of the land held by the Omahas in 1854 were given as "North by Eauqui-Court [Niobrara], E. by Missouri, S. by the Platte, and W. by longitude 98° west."

The Otoes and Missouris are shown as having a population of 1,000 Indians owning 3,200,000 acres of land, with 3,555 acres per Indian, held by Indian title. The boundaries of the land held by the Otoes and Missouris in 1854 were given as "North by Platte, east by Missouri, south by Little Nemaha."

On May 30, 1854, the Kansas-Nebraska Act was passed, 10 Stat. 277. Section 1 provided for the creation of the Territory of Nebraska, and Section 19 for the Territory of Kansas. Both sections contained the following proviso:

> "Provided further, that nothing in this act contained shall be construed to impair the rights of person or property now pertaining to the Indians in

---

87. U. S. House of Representatives, 33d Cong., 1st Sess., 1853–1854 (Serial No. 743).

88. In the case of the Otoes, Pawnees and Omahas, the acreage per Indian given in the table is a figure which cannot be reached by a mathematical computation using the total acreage given and the population figure listed. However, a computation based on the figures given reveals that the Pawnees did not have more land per Indian than the other two indigenous Nebraska tribes, i. e., the Otoes and the Omahas, but in fact less.

89. "North by Platte" is obviously a misprint. After the 1833 cession, the Pawnee lands remaining were bounded by the Platte on the south. Furthermore, the remaining land could not possibly have been bounded on the North by the Platte and on the East by the Omahas, since the Omaha lands were considerably north of the Platte River. This document is concerned not with the amount of land ceded by the indigenous tribes but with amount and location of the land remaining in their possession at the time the table was made. We believe this table is significant in that it contains an estimate by the Government of the land believed to have been owned by the Pawnees in 1854.

said Territory, so long as such rights shall remain unextinguished by treaty between the United States and such Indians, or to include any territory which, by treaty with any Indian tribe, is not, without the consent of said tribe, to be included within the territorial limits or jurisdiction of any State or Territory [most of the emigrant tribes who were induced to exchange their lands in the east for lands in Kansas and Nebraska, had a provision in their treaties that their new homes in the Indian country would never, without their consent, be included in the territorial limits of any State or Territory]; but all such territory shall be excepted out of the boundaries, and constitute no part of the Territory of Nebraska, until said tribes shall signify their assent to the President of the United States to be included within the said Territory of Nebraska, or to affect the authority of the government of the United States to make any regulations respecting such Indians, their lands, property, or other rights, by treaty, law, or otherwise, which it would have been competent to the government to make if this act had never passed."

At the time of the passage of the above act, there were three types of land in the country included within the limits of the Nebraska territory: (1) lands to which original Indian title had been extinguished and which had been regranted by treaty in perpetuity to Indians removed from east of the Mississippi River under the provisions of the Act of May 28, 1830, 4 Stat. 411. These lands constituted a narrow strip along the western boundary of Missouri; (2) lands to which original Indian title had been extinguished but which had not been regranted to other Indians, and title to which was in the United States. This was the land south of the Platte ceded by the Pawnees and the Otoes and Missouris in 1833; (3) lands to which original Indian title had never been extinguished and which were still occupied by the in-

digenous tribes but without guarantees in perpetuity, as in the case of the emigrant tribes. This land was north of the Platte, plus two small districts south of the Platte and west of the Missouri, plus lands traversed by the western tribes of Colorado and Wyoming.

Prior to 1854, it had become clear to the Government that Kansas and Nebraska could no longer be used as an Indian country because such use interfered with the tide of white emigration to the Pacific Coast and prevented the formation of a continuous line of white settlements between the eastern settlements and Oregon and California. There was also the problem of establishing a central route for the Pacific Railroad.

Pursuant to the 1853 and 1854 acts above referred to, treaties were negotiated with the Nebraska indigenous tribes beginning with the Otoe and Missouri Treaty of March 15, 1854, wherein those Indians ceded all their lands west of the Missouri River except for a strip on the Big Blue River 10 miles wide and 25 miles long, granting to the United States a right-of-way for roads and railroads through the lands so reserved. 10 Stat. 1038.

On March 16, 1854, the Omaha tribe ceded most of their lands west of the Missouri, 10 Stat. 1043. On September 24, 1857, the Pawnees made their treaty of cession, 11 Stat. 729, and on March 12, 1858, the Poncas ceded their lands, 12 Stat. 997.

Negotiations for the Otoe and Missouri and for the Omaha treaties of cession came before the Pawnee negotiations because the lands of the former tribes bordered on the Missouri River and were urgently sought after by white settlers. As a result of white settlements on the western portion of the land purportedly ceded by the Omahas in 1854, and located close to certain Pawnee villages, difficulties arose between the white settlers and the Pawnees who claimed that the land so settled actually belonged to them and that the United States had no right to purchase it from the Omaha tribe.[90] On

90. See letter dated October 15, 1856, from Mr. Izard to Maj. Cummings, Supt. of Ind. Affairs, at St. Louis, in the National Archives, Records of the Bureau of In-

October 28, 1856, the Pawnee school teacher and interpreter, Samuel Allis, wrote to Major Cummings [91] and stated that he went to the Pawnee village near the Omaha cession to investigate the complaints of the white settlers against the Pawnees. He stated that in his opinion the Pawnees' claim to the strip of land settled on by the whites and purportedly included in the Omaha cession, was a good claim: [92]

"I have been 23 years in this country and I have always understood that Shell Creek was the dividing line between them [the Pawnees] and the Omahas, and the Omahas sold to Beaver Creek which is a difference of 40 miles [west] up the Platte, and this is the great cause of dissatisfaction on the part of the Pawnees, and their remaining where they are now greatly retards the settling of the country by the whites; therefore I think it highly important that a treaty should be made with them as soon as practicable."

During the previous year, Col. Manners, the Deputy to the Surveyor General of the Territories of Kansas and Nebraska, reported [93] on October 6, 1855, that completion of the guide meridian and standard parallels in Nebraska would have been completed but for the interference by the Pawnees who pulled up all the surveyor's posts on the north side of the Platte and refused to permit the work to continue. They informed the surveyor that they owned the land east to the Elk Horn. The Government's representatives were finally able to convince the Pawnees that the Government did not intend to occupy the land and that if the land did belong to the Pawnees the running and marking of the lines and the erection of corners did not invalidate their title.

The Annual Report of the Commissioner of Indian Affairs of November 22, 1856,[94] discussed the necessity for negotiating treaties with the Poncas and the Pawnees. It was suggested that the Poncas might be settled on a reservation on the Blackbird Hill reserve with the Omahas who were of the same origin and spoke the same language. It was suggested that the Pawnees might be settled near their friends the Otoes. It described the deplorable condition of both tribes as a result of the increasing number of white settlements springing up in Nebraska.

On December 1, 1856, John Rickley, a white settler on the land included in the Omaha 1854 cession and claimed by the Pawnees, wrote to the Indian office referring to the dispute and urging that steps be taken to settle the matter.[95]

On April 21, 1857, Mr. Dennison, the recently appointed agent for the Pawnees, held a council at the Pawnee Village located near the disputed Omaha cession lands, to investigate the complaints of the white settlers against the Pawnees and the claim of the Pawnees to the land. A copy of the council minutes were introduced in evidence herein as claimant's exhibit 63.

dian Affairs, Letters Received, Otoe and Missouria file, 1856, C528 (encl.). This letter was forwarded to Commissioner of Indian Affairs Mannypenny.

91. National Archives, Records of the Bureau of Indian Affairs, Letters Received, 1856, Otoe and Missouria file, C562 (encl.).

92. In the 18th Annual Report of the Bureau of American Ethnology, Indian Land Sessions, Royce gives the Omaha boundary to Shell Creek and notes that in 1842 their agent had stated that the tribe claimed farther west to Beaver Creek. The 27th Annual Report of the Bureau of American Ethnology, devoted entirely to the Omaha Tribe, notes, among other things, that the Govern-

ment, in the 1857 treaty with the Pawnees, recognized the Pawnee claim to this strip of land included in the Omaha cession. See claimant's exhibit 66, which is an excerpt from this report.

93. U. S. House of Representatives, 34th Cong., 1st Sess., 1855–1856, H. of R. Executive Documents No. 1, Report of Surveyor General of Kansas and Nebraska Territories, pp. 308, 319 (Serial No. 810).

94. U. S. House of Representatives, 34th Cong., 3rd Sess., 1856–1857, H. of R. Executive Document No. 1, p. 554 ff. (Serial No. 893).

95. National Archives, Records of the Bureau of Indian Affairs, Letters Received, 1856, Otoe and Missouri File, R152.

During the course of the council, one of the Pawnee chiefs admitted that young Pawnee warriors had committed depredations on the white settlements nearby and stated:

"We believe the white settlers in this section of the country to be opposed to us, and would like to see our race exterminated. Are very sorry that we have had no interpreter, that we might have been able to have made our wrongs known. The whites tell us that the Government purchased from the Omaha all the land on the other side of the river. We were the cause of the depredations committed last fall. We thought we had a right to do as we pleased with our own land, and thought it very strange that we could not visit a white man's house without being abused."

Another chief stated in part:

"We are willing to make a treaty and would first like to make a statement to our Grand Father about the treachery of some of the other tribes in appropriating our lands to their uses, which they have no right to do. * * * As we have a great deal of land, hope that if we succeed in making a treaty with our Grand Father, that it will be such a one as will afford us a living for many years to come; we received but little when we made our last treaty and now that lands have become increased in value, expect to receive a much larger amount."

Much of the council was devoted to a discussion of the murder by a white settler of a young Pawnee chief who had gone to the settler's house to beg for food.

At the conclusion of the talks, Mr. Dennison assured the tribe that he would convey their sentiments to the Grand Father, and that in the meantime he would advise the tribe to see as little as possible of the neighboring whites.

We think that this council represents part of the treaty negotiations which were later carried forward by Commissioner of Indian Affairs Denver.

In Commissioner Denver's letter to the Secretary of the Interior, dated May 23, 1857, and referred to by the Indian Claims Commission in its opinion, Mr. Denver referred to Dennison's council in April with the Pawnees, and to the letters from the Governor of the Nebraska Territory and from Samuel Allis of the previous year, relative to the Pawnee claim to the land ceded by the Omahas and settled by the whites. He suggested that the Pawnee Agent be authorized to bring a delegation of Pawnees to Washington for the purpose of entering into a treaty whereby the Pawnees would cede to the United States their lands north of the Platte and accept a small area of land for their permanent home. He noted that a balance of $18,580.83 remained out of the 1853 appropriation for "extinguishing the title of Indian tribes to lands west of Missouri and Iowa." [96]

As noted by the Indian Claims Commission, Commissioner of Indian Affairs Denver was authorized on August 15, 1857, by the Secretary of Interior, to enter into negotiations with the Indian tribes west of Missouri and Iowa. The letter of authorization stated that he was to act in accord with the provisions of the Act of March 3, 1853, supra, and he was instructed to visit the Sioux, Ponca and Pawnee Indians, among others, to examine their country and obtain all the information "necessary to the preparation of full and detailed instructions as to the terms and conditions of any treaties to be made with them, or any other tribes * * *." He was directed to go at once to the Indian country and "discharge this preliminary duty." He was told that if, on his trip of inspection and investigation, he felt it expedient and proper to actually negotiate any treaties for the extinguishment of a tribe's title to land, or to secure their assent to the settlement of white citizens on their land, he was fully authorized to do so.[97] On the same day, Commissioner Denver wrote to Indian

---

**96.** This letter is in evidence as defendant's exhibit 69, and excerpts therefrom as plaintiff's exhibit 62.

**97.** Defendant's exhibit 70.

Agent Dennison directing him to assemble the Pawnees for treaty negotiations.

In the Annual Report of the Commissioner of Indian Affairs for 1857 there appears Report No. 54 from the Central Superintendency[98] stating that the Government had purchased from the Omahas in 1854 certain lands claimed by the Poncas and the Pawnees; that the lands had been settled by the whites and that the Pawnees and Poncas "deprived of their traditional rights" were restless and insubordinate. The report further stated that "Policy requires that treaties should be negotiated with these tribes; and that the Poncas should be settled upon the reserve of the Omahas, who speak the same language; and the Pawnees upon that of the Otoes, with whom they are on friendly terms."

On September 30, 1857, Pawnee Agent Dennison wrote to Superintendent Harvey at St. Louis concerning the treaty just concluded by Commissioner Denver with the Pawnees. He stated that he would not comment on the treaty prior to its ratification, except to say that he anticipated the results would be most beneficial to all concerned.[99] At the beginning of the letter he remarked that the first two months following his appointment the prior March had been consumed in adjusting the difficulties between the white settlers and the Pawnees.

On November 9, 1857, Commissioner Denver wrote to the Secretary of the Interior forwarding the Pawnee treaty negotiated on September 24. As stated above, this letter, together with the other treaty documents, was printed for the use of the Senate, and later was published in Vol. 50 of Confidential Documents, U. S. Senate, 35th Cong., 1857–1859, at pages 53 and 54. The letter is mentioned under item (4) in the National Archives List of Treaty Documents. It reads, in pertinent part, as follows:

"I have the honor to send up herewith articles of agreement and convention, entered into on the 24th of September by me with the confederated bands of Pawnee Indians, that they be submitted, if you concur, to the President, and laid by him, if he approves, before the Senate for its constitutional action thereon.

"There have been acquired hereby all the lands which these Indians own or claim, except a reservation of 288,000 acres; the number of acres acquired will reach, by approximation, the amount of 11,842,980 acres. This acquisition is bounded on the east by a line drawn from the mouth of the Mauvaise river to the mouth of Shell creek; on the south by the lands heretofore ceded by the Pawnees; on the west by a line running due north from the junction of the north with the south fork of the Platte river to the Keha-Paha river; and on the north by the Keha-Paha to its junction with the E'eau qui Court [Niobrara] river; thence by that river to the western boundary of the late Omaha cession. Within the limits aforesaid the reservation of the Pawnees is located.

"*I could here remark that the Pawnees claimed much further east than was allowed by me, but I was satisfied that they justly owned up to Shell creek, which includes a space of about thirty miles in breadth embraced in the purchase made of the Omahas in 1854.*" [Italics added.]

There then follows a detailed account of the other terms of the treaty relative to the consideration to be paid by the Government, and the rights granted to the Government upon the reservation.

As to conflicting claims of the Sioux on the west, it is true that the Sioux eastern boundary as established by the 1851 Fort Laramie Treaty is somewhat east of the western boundary of the Pawnee cession described in the 1857 treaty. But appellant is willing that the Fort Laramie line should

---

98. U. S. House of Representatives, 35th Cong., 1st Sess., 1857–1858, H. of R. Executive Document No. 2, p. 405 (Serial No. 942).

99. Defendant's exhibit 39.

form the western boundary of the 1857 cession (as well as of the 1833 cession).

As to defendant's contention that the Pawnee 1857 cession conflicted with Ponca claims, the treaty documents listed in Special List No. 6, throw some light on this situation. In a memorandum of Acting Commissioner of Indian Affairs Mix to the Secretary of the Interior, dated January 11, 1858, Mr. Mix indicates the boundaries of the land which the Government believed was actually owned by the Poncas by reference to an accompanying map. That map, compiled by Captain Eastman in 1854, was marked with colored lines to show the boundaries of the various tribes north of the Platte and to show the Omaha and Pawnee cessions of 1854 and 1857, respectively. The original 1854 map, without the markings referred to, was photostated and offered in evidence by appellant as its exhibit 51. The copy of the map in the Ponca and Pawnee treaty files in the Senate Archives had been brought up to date to show the acreage ceded by the Pawnees in 1857 as being 11,842,980 acres, and the land set aside as a reservation as comprising 288,-000 acres. The lines on the map indicated no conflict between the Pawnee cession of 1857 and the area the Government appeared to recognize as Ponca lands.

Mr. Mix's memorandum of January 11, 1858 contained an interesting comparison of the consideration given to the Pawnees and the consideration being asked by the Poncas. After describing the "probable extent" of the Ponca lands, Mr. Mix stated:

"By an approximate estimate, the area of the lands within the last mentioned lines [the 'probable' extent of Ponca country immediately east of the territory claimed by the Sioux] will embrace seven millions of acres and the aggregate consideration which the Poncas propose to receive for the same amounts to $970,000 or .14⁷⁄ cents per acre. I will here institute a comparison with the cession made by the Pawnees in the Articles of convention recently concluded with them in which they cede about Twelve millions of acres of land for the consideration of $840,000 or 7 cents per acre, being a fraction over one-half of the consideration demanded by the Poncas."[1]

Both the Pawnee and Ponca treaties of cession were under consideration at approximately the same time, and in both cases the tribes were not allowed by the Government all they claimed in the way of extent of territory.

For the reasons set forth in connection with claims 1 and 2, we shall set aside the Commission's findings and determinations and remand this claim to the Indian Claims Commission for further consideration, the making of new findings of fact respecting the pertinent issues, and for whatever further proceedings the Commission and the parties may deem necessary.

### Claim 5

This is a claim for just compensation for 4,800 acres of appellant's land admittedly taken by defendant. It is appellant's contention that the land was worth at least $3.00 an acre in 1875 when the Government, by Act of Congress, 18 Stat. 420, paid appellant $1.25 per acre. Appellant asks judgment for the difference. It was defendant's contention that, admitting the land to have been taken, appellant was adequately compensated for its value by the payment of $6,000 in 1875. The Commission denied appellant's recovery on this claim because it found that (1) the record did not disclose when the land was taken; (2) the record did not disclose precisely what land was taken.

As in the first four claims, certain of the facts referred to in the Commission's opinion on this claim are not to be found in the findings. For the purposes of this appeal we shall treat the facts referred to and relied on by the Commission in its opinion as having been found. The Commission considered the following facts to constitute the record on this claim. Article I of appellant's treaty of September 24, 1857, provided that out of the Nebraska land ceded by the Pawnees to the United States, there should be carved a reservation 30 miles long

1. National Archives, Records of the Bureau of Indian Affairs, Letter Sent Report Book No. 10, p. 350.

from east to west, by 15 miles wide from north to south. Upon the resurvey of the boundaries of this reservation, it was discovered that the original survey had been in error to the extent that the actual boundaries set by that survey included 4,800 acres less than the acreage called for by the treaty. The Commission states that the record does not disclose when the resurvey was made, but that the error was reported to the Secretary of the Interior by the Commissioner of Indian Affairs on December 20, 1873; that the Secretary recommended to Congress that the Pawnees be indemnified for the shortage, and that Congress, pursuant to the Act of March. 3, 1875, 18 Stat. 420, 448, appropriated the sum of $6,000 for that purpose. The Commission notes that when the Pawnee reservation lands were appraised for sale under the Act of April 10, 1876, 19 Stat. 28, the appraised values ranged from $1.25 to $6.00 per acre, with many tracts appraised at $1.25, $1.50, and $2.00 per acre. The Commission then states that, not knowing the location of the 4,800 acres taken, it is impossible to determine whether such land was of the $1.25 an acre or $6.00 an acre quality.

In essence, this claim failed through failure of proof. Under the usual standards applied to a taking claim, a claimant certainly has the burden of proving precisely what land was taken, the time of taking, and the then value of the land taken. This the claimant has not done. However, by the use of its investigatory powers, the Commission could easily have ascertained the basic facts of this claim. As to the location of the land taken, Executive Document 42, 43rd Congress, 1st Session, 1873-74,[2] provides considerable information. Defendant placed in evidence two letters printed in that document. The first letter, dated January 5, 1874, from the Secretary of the Interior to the Speaker of the House of Representatives, suggests that $6,000 be appropriated to indemnify the Pawnees in Nebraska for 4,800 acres of land excluded from their reservation by an error in the survey of the boundary lines. The letter refers to enclosures consisting of a letter of December 20, 1873 from the Commissioner of Indian Affairs, and a letter of June 11, 1873 from the Superintendent of Indian Affairs, Northern Superintendency, "giving the facts in the case." Defendant's exhibit contains the letter of December 20, 1873, but does not contain the other enclosure, printed in Executive Document 42, and dated June 11, 1873. That letter, appearing on pages 2 and 3 of the Executive Document, reads as follows:

"Northern Superintendency,
"Office of Superintendent Indian Affairs,
  "Omaha, Nebr., Sixthmonth 11, 1873.

"Respected Friend: Having been informed that white settlers along the eastern line of the Pawnee reservation were incroaching upon its limits, I addressed a letter to the Hon. Commissioner of Indian Affairs, dated eleventhmonth 2, 1872, suggesting the propriety of a resurvey of the boundaries of said reservation.

"I have recently been informed by Richards and Brother, surveyors, that they were duly commissioned by the proper authorities at Washington, to make said resurvey, and have now completed it, and find the reservation, as laid out and marked by previous Government surveyors, to be twenty-nine and one-half miles long from east to west by fifteen miles wide from north to south, whereas the treaty between the United States and the four confederated bands of Pawnee Indians, made September 24, 1857, provides for a reservation thirty miles long from east to west by fifteen miles wide from north to south, leaving a deficiency of land in the present reservation of 4,800 acres.

"The surveyors informed me that they would mention the error in their official report to the superintendent of the land office, and point out the place where it occurred.

"The original survey commenced at the proper initial point, and the error was made on the southern line going

2. House of Representatives Executive Document (Serial No. 1606).

westward, the Indians are thus entitled to a strip of land west of their reservation half a mile wide, and in length the width of the reservation, or fifteen miles. Said land, I am told, is all settled by whites, and is much more fertile than the land south of the Loup about being sold under an act of Congress.

"The Indians already have an excess of land, and there appears to be no occasion for interfering with the settlements on said strip of land.

"I would respectfully ask on behalf of said Pawnee Indians, that proper steps may be taken to obtain from the United States Government a full and just consideration for the deficiency of land mentioned, for the use and benefit of the Pawnee Indians, and that the amount so obtained may be expended only in such manner as will advance the tribe in civilization.

"Very respectfully, thy friend,
"Barclay White,
"*Superintendent Indian Affairs.*
"Hon. Edward P. Smith,
"*Commissioner Indian Affairs,*
"*Washington, D. C.*"

According to the above letter, the land taken was a strip "of land west of their reservation half a mile wide, and in length the width of the reservation or fifteen miles." If the Commission does not wish

to rely on the Superintendent's location of the land erroneously omitted from the original survey, it can resolve any doubts it may have by a comparison of the outer boundaries established by the original survey with the boundaries established by the resurvey. The resurvey was made by William A. Richards, Deputy Surveyor, under Contract No. 69, dated December 14, 1872. The field notes of the resurvey are among the records of the General Land Office, Department of the Interior, in Nebraska Volume 64, Field Notes. The resurvey was commenced on April 29, 1873, and completed May 8, 1873.[3]

Once the land is located, as we believe it may readily be from the material alluded to above, the time of taking should be possible of determination.

Inasmuch as we believe that it was the intent of Congress that claims under the Indian Claims Commission Act should only be determined on the most complete record possible, we shall set aside the Commission's determination and findings, and remand this claim for further proceedings and findings on the matter of the location of the land, the time of taking, and the value of the land taken.

### Claims 6 and 7

These claims are for the value of two tracts of land in the Pawnee reservation in

3. The circumstances which occasioned the resurvey of the reservation are revealed by correspondence in the records of the Bureau of Indian Affairs and of the General Land Office in the National Archives. On October 29, 1872, Pawnee Agent Troth wrote to Superintendent White informing him that in his opinion the white settlements had extended over the eastern boundary line of the Pawnee Reservation (Bureau of Indian Affairs, Letters Received, Pawnee— 1872). Apparently the original monuments and stakes had become indistinct or had been destroyed and Troth asked that the lines be remarked to avoid future difficulty. On November 2, 1872, Superintendent of Indian Affairs White wrote to Commissioner of Indian Affairs Walker, enclosing Troth's letter, and recommending that a resurvey be made and the boundary lines thoroughly marked. (Letter and enclosure, No.

485.) On November 8, 1872, Commissioner Walker wrote to the Secretary of the Interior referring to the above letters from White and Troth, and recommending that the Commissioner of the General Land Office be asked to have the exterior boundary lines of the Pawnee reservation resurveyed and plainly marked. On November 11, 1872, the Acting Secretary of the Interior wrote to the Commissioner of the General Land Office transmitting the letter of Commissioner of Indian Affairs Walker, and recommending that the resurvey be made (Misc. Letters Received, No. 22673, Records of the General Land Office, National Archives). A contract for the resurvey was let to William A. Richards (Contract No. 69) on December 14, 1872; and the contract and the instructions to the surveyor are in the records of the General Land Office at the National Archives.

Oklahoma. Claim 6 relates to 88.43 acres of land which appellant alleges were sold in 1907 without its consent to the Town of Pawnee for an inadequate consideration ($110.55) credited to its account in 1921. Claim 7 relates to 25.54 acres of land which were patented by the United States to the Home Mission Board of the Southern Baptist Convention on June 3, 1920, without any consideration having been paid to the Pawnees. Both plots were included in a 755 acre tract which had been reserved for Indian school and agency purposes. It is the opinion of the Indian Claims Commission that the whole 755 acre tract was ceded to the United States and became public lands pursuant to the Agreement of November 23, 1892, between the United States and the Pawnee tribe, ratified and confirmed by Congress on March 3, 1893, 27 Stat. 612, 644. According to that Agreement, the Pawnees were entitled to allotments of land in severalty, and to have credited to their account $1.25 per acre for each acre of so-called surplus land ceded to the United States. Since the land involved in these claims was not allotted to individual Indians, the Commission concluded that it was surplus land and that the Pawnees were entitled to have credited to their account as of March 3, 1893, $1.25 for each acre of such land. The Commission accordingly determined that appellant was entitled to interest on the $110.55 actually paid to the Pawnees for the 88.43 acres sold to the town of Pawnee pursuant to the Act of March 1, 1907, 34 Stat. 1015, 1044, from March 3, 1893, to March 17, 1921, the date on which the $110.55 was finally credited to the Pawnee account, since the Agreement of 1892 provided that the consideration to be paid for the surplus land should bear interest at five percent per annum. With respect to the 25.54 acres patented to the Home Mission Board of the Southern Baptist Convention, the Commission determined that the tribe was entitled to $1.25 per acre, or a total of $31.90, for such land under the terms of the 1892 Agreement, plus interest at the rate of five percent per annum from March 3, 1893.

It is appellant's contention that the Commission was in error in holding that the portion of the "reserved" lands so disposed of were "surplus lands" for which the tribe agreed in 1892 to accept only $1.25 per acre. It is appellant's position that the whole 755 acre tract on which these lands were located had been reserved for school and agency purposes and remained tribal property, not subject to allotment under the 1892 Agreement, and not passing to the Government as surplus lands under that agreement, and that accordingly the Pawnees are entitled to judgment for the fair market value of the lands at the times of taking, which values appellant alleges are greatly in excess of the $1.25 per acre agreed upon for the surplus lands.

In a suit by this tribe under a special jurisdictional act, Pawnee Tribe of Indians v. U. S., 56 Ct.Cl. 1, this court found that whereas the Government had agreed in 1892 to pay the Pawnees $1.25 per acre for all the surplus lands ceded under the Agreement, only $80,000 had been so paid and that the tribe had a good claim for the balance due. In computing the amount due, the court deducted the 755 acres of unallotted land which had been reserved for school and agency purposes on the ground that title to such land remained in the tribe. The Indian Claims Commission does not agree with this court's holding in that respect, and believes that under the terms of the 1892 Agreement all the unallotted land was ceded to the United States, including the 755 acres reserved for school and agency purposes. If the Commission's interpretation of the Agreement is correct, then its determinations on claims 6 and 7 must stand.

The Act of February 8, 1887, 24 Stat. 388, 25 U.S.C.A. §§ 331–334, 339, 341, 342, 348, 349, 381, entitled "An act to provide for the allotment of lands in severalty to Indians on the various reservations, and to extend the protection of the laws of the United States and the Territories over the Indians, and for other purposes", provided that where a tribe had been located on a reservation created for its use by treaty or otherwise, the President might cause the reservation to be surveyed and the land allotted in severalty to any Indian located thereon in a prescribed manner and amount

unless a treaty or act of Congress provided for allotments in quantities in excess of those provided in the subject Act, in which case the allotments should be in the larger amounts as provided in the treaty. Section 2 of that Act provided for the selection of the allotments by the individual Indians. Section 3 provided that the allotments selected should be made by special agents appointed by the President, under rules and regulations prescribed by the Secretary of the Interior. Section 5 provided that at any time after the lands had been allotted, or sooner if the President deemed best, the Secretary of the Interior should negotiate with the tribe for the purchase and release by the tribe of such portions of the reservation not allotted as the tribe "shall, from time to time, consent to sell, on such terms and conditions as shall be considered just and equitable between the United States and said tribe of Indians, which purchase shall not be complete until ratified by Congress". Section 5 also provided, in part, as follows:

"And if any religious society or other organization is now occupying any of the public lands to which this act is applicable, for religious or educational work among the Indians, the Secretary of the Interior is hereby authorized to confirm such occupation to such society or organization, in quantity not exceeding one hundred and sixty acres in any one tract, so long as the same shall be so occupied, on such terms as he shall deem just; * * *."

On March 17, 1891, Miss Helen P. Clarke was appointed a Special Agent to make allotments of land in severalty on the Ponca, Pawnee, and other reservations in Oklahoma. The letter notifying her of her appointment read, in part, as follows:

"Under date of September 6, 1890, the President granted authority for making allotments of land in severalty to the Indians on the Ponca, Pawnee * * * reservations in Oklahoma under the Act of February 8, 1887, and the Secretary has designated you as Special Agent to make said allotments.

* * * * * *

"Your attention is called to the provisions of the Act of 1887, with reference to religious societies or organizations. A supplemental schedule will be prepared and submitted by you for the action of the Secretary of the Interior under the provisions of Section 5, showing the lands, not exceeding 160 acres in any one tract, occupied upon the reservation at the date of passage of the said act of February 8, 1887, by any religious society or organization, for religious or educational work among the Indians. You will also put upon this schedule all tracts occupied for Government or school purposes."

The work of making the allotments was commenced at once by Miss Clarke and other special agents, and was carried on pursuant to the instructions issued on March 17, 1891, and other instructions subsequently issued on November 26, 1892 and April 22, 1893. On November 23, 1892, the Pawnees and the United States entered into the so-called Jerome Agreement which was ratified by Congress in the Act of March 3, 1893, 27 Stat. 612, 644. The Agreement provided in Article I that the Pawnees ceded their Oklahoma reservation to the United States; that whereas the President had directed that the individual members of the tribe should take allotments in the reservation and hold titles thereto in severalty and that an allotting agent had been appointed and was, at the time of the agreement, then engaged in prosecuting that work, the allotments made and to be made should "in all things be confirmed." Article II provided that title to the allotments so made should be governed by the provisions of the Act of February 8, 1887, except as otherwise expressly provided in the Agreement. The Agreement provided that all allotments should be selected by the allottees within four months after the ratification of the Agreement, unless the time should be extended by the Secretary of the Interior; that no allotment should be taken on land "now being used for church or educational purposes, or for public use by the United States, or on sections sixteen (16) and

thirty-six (36) in each township." Article IV provided that "As an additional and only further consideration for such cession and conveyance" the United States would pay to the tribe $1.25 per acre "for all the surplus land in said reservation, after the allotments herein provided for shall have been taken and approved by the Secretary of the Interior." The payment was to be made as follows:

"Eighty thousand dollars in coin, to be distributed among them per capita at the subagency on said reservation upon the ratification of this agreement by Congress, and the residue of the proceeds of said surplus lands shall be placed to the credit of said tribe in the Treasury of the United States, and bear interest at the rate of five per centum per annum, there to remain at the discretion of the United States, the interest to be paid annually and be distributed to said tribe per capita on said reservation."

The Agreement was ratified and confirmed by Sections 12 and 13 of the Act of March 3, 1893, supra. Section 12 appropriated $80,000 as part payment, and provided that the residue of the proceeds due the tribe for the surplus lands should be placed to the tribe's credit in the Treasury of the United States to bear interest at the rate of five percent per annum. Section 13 provided that the lands acquired by the Government under the Agreement were thereby declared a part of the public domain but that Sections 16 and 36 in each township were reserved from settlement for the use and benefit of public schools. All other lands should be opened to settlement by proclamation of the President at the time and in the manner provided in Section 10 relating to the lands acquired from the Cherokee Nation of Indians. Section 10 provided that, under the direction of the President, the Secretary of the Interior should prescribe rules and regulations for the occupation and settlement of the lands to be incorporated in the proclamation of the President.

No specific provision was made in the Agreement or the Act of March 3, 1893, for the land to be reserved for school and agency purposes pursuant to the 1887 Act except that no allotment could be selected from such land unless an Indian had previously erected improvements on some portion of it.

On June 6, 1893, Special Agents Clarke and Wood certified that the Supplemental Schedule which they had prepared showing the land used for agency and government school purposes on the Pawnee Reservation in Oklahoma was correct and in accordance with the 1887 Act and the instructions, approved by the Secretary of the Interior, of March 17, 1891.

On the back of the Supplemental Schedule there appeared the following statement dated July 8, 1893, signed by D. W. Browning, Commissioner of Indian Affairs:

"Respectfully submitted to the Secretary of the Interior with the recommendation that the several tracts of land within described be reserved for the purposes indicated as to each of said tracts."

On the back of the same document there also appears the following statement signed by the Acting Secretary of the Interior, and dated July 10, 1893:

"The above recommendation of the Commissioner of Indian Affairs is hereby approved."

On July 10, 1893, the Acting Secretary of the Interior wrote to the Commissioner of Indian Affairs stating, in part, as follows:

"I have approved the schedules of allotments made to the Pawnee Indians under the provisions of the agreement of November 23, 1892, ratified and confirmed by the Act of March 3, 1893, 27 Stat. 644, which were submitted with your letter of the 8th instant.

"The duplicate copy has this day been transmitted to the Commissioner of the General Land Office with instruction to issue patents to the several allottees, for the lands allotted to them, as prescribed by the fifth section of the Act of February 8, 1887, as stipulated in the second article of the agreement with said Indians, and to note as reserved the tracts selected for agen-

cy, school and cemetery purposes. * * *"

On the same day, the Acting Secretary of the Interior wrote to the Commissioner of the General Land Office stating that he had approved the allotments to the Pawnees and directing the Commissioner to issue patents to the respective allottees in the manner prescribed by the Act of February 8, 1887, and the 1892 Agreement. He transmitted to the Commissioner the supplemental schedule showing "the lands reserved for agency, school, and cemeteries," and directed that those lands "be noted on the tract books as reserved for the purposes indicated."

Pursuant to the Act of March 1, 1907, 34 Stat. 1015, 1044, there was granted to the Town of Pawnee for certain public purposes a certain tract of land in section 32 of township 22, north, range five east, "said lands hereby granted being a portion of the Pawnee Indian Reservation set apart for agency and school purposes at the Pawnee Agency in said county under Act of Congress approved February eighth, eighteen hundred and eighty-seven, as amended by Act of Congress approved February twenty-eighth, eighteen hundred and ninety-one, and in accordance with the instructions from the Acting Commissioner of Indian Affairs dated March seventeenth, eighteen hundred and ninety-one, * * *." The act provided that the lands were to be held and used by the town for park, educational, and other public purposes; that in any schools maintained thereon the Pawnee Indian children should be admitted free of charge and on terms of equality with the white pupils. The act provided that the Town of Pawnee should pay $1.25 per acre for the land. It appears that $110.55, representing $1.25 per acre for the land so sold, was finally credited to the Pawnee account on or about March 17, 1921, approximately three months after the decision of this court holding that the Pawnees had a just claim for the unpaid balance due for their surplus lands ceded to the United States in 1893. The land sold to the Town of Pawnee was located in the 755-acre tract reserved for school and agency use. No interest on the $110.55 was credited to the Pawnee account.

The Act of March 3, 1909, 35 Stat. 781, 814, authorized the Secretary of the Interior to issue a patent in fee simple to the duly authorized missionary board of any religious organization engaged in mission or school work on any Indian reservation, for such lands as had been set apart previously and were then being used and occupied by such organization for mission or school purposes. On June 3, 1920, under the authority of that Act, a patent was issued to the Home Mission Board of the Southern Baptist Convention for 25.54 acres located on the 755 acre tract reserved for school and agency purposes in 1893. The particular land so patented, had previously been set apart for school and mission work pursuant to the Act of February 8, 1887. The patenting of this land in fee to the Mission Board was noted on the Supplemental Schedule of land reserved for school and agency purposes, approved by the Acting Secretary of the Interior on July 10, 1893. No consideration for this plot of land was ever credited to the Pawnee account.

From a consideration of all the above noted facts and circumstances, and from the language of the 1892 Agreement with the Pawnees and the Act of 1893 ratifying and confirming such agreement, we agree with the Commission's conclusion that title to the land involved in the 6th and 7th claims herein passed to the United States on March 3, 1893, and that as of that date the Pawnees were entitled to have credited to their account $1.25 per acre for each acre in question plus interest at the rate of five percent per annum as provided in the Agreement. The subsequent reservation or setting apart of that land for school and agency purposes in July of 1893 merely had the effect of withdrawing it from settlement and sale and did not revest title in the tribe to the land so set apart.[4] Accordingly, we affirm the

---

4. In the Agreement of May 1, 1893, between the Nez Perce Indians in Idaho and the United States, ratified August 15, 1894, 28 Stat. 327, the Indians disposed of a portion of their Idaho reservation to the United States. The Agreement,

Commission's final determinations of claims 6 and 7.

It should be noted that the theory of appellant's 6th and 7th claims was that the United States had taken tribal lands without the tribe's consent and without the payment of just compensation therefor within the meaning of Section 2(1) of the Indian Claims Commission Act. It was the Commission's conclusion from the facts pleaded and proved that the lands in question were conveyed by the tribe to the United States under the 1892 Agreement but that the compensation agreed upon had not been paid. In awarding judgments on these claims, the Commission held that appellants were entitled to the compensation agreed upon and apparently regarded these claims as falling under Section 2(4) of the Act which provides as follows:

"claims arising from the taking by the United States, whether as the result of a treaty of cession or otherwise, of lands owned or occupied by the claimant without the payment for such lands of compensation agreed to by the claimant; * * *."

The inclusion of interest in the award on each claim was pursuant to the terms of the 1892 Agreement.

In summary, the determinations of the Indian Claims Commission on Claims 1 through 5 inclusive, are set aside and the causes remanded to the Commission for further proceedings not inconsistent with this opinion. The Commission's determination on Claims 6 and 7 are hereby affirmed.

MADDEN and LITTLETON, Judges, concur.

in Article I, provided specifically that all unallotted land should pass to the United States except (Article II) certain portions "excepted from this cession and reserved for the common use of the tribe". Article VI of the Agreement provided that any of the ceded lands occupied and used under proper authority for religious or educational work among the tribe, might be patented to the religious organization for $3 an acre. The

WHITAKER, Judge (concurring).

In the light of the additional evidence set out or referred to in the majority opinion which was not considered by the Indian Claims Commission, I think the case should be remanded to it for further consideration.

The majority opinion calls attention to section 13(b) of the Indian Claims Commission Act requiring the Commission to set up an Investigation Division to investigate claims referred to it by the Commission, and to make the result of its findings available to the parties, and it says that this section should have been invoked in this case. This section does not require all claims to be referred to this Investigation Division. I take it that it is within the discretion of the Commission to refer a claim to it or not to do so. It is the primary duty of the parties to gather the evidence and present it to the Commission. If the Commission feels that the parties have been diligent and have apparently presented all available evidence to it, I see no necessity for the Commission to refer the claim to its Investigation Division. Apparently the Commission thought that had been done in this case.

However, it seems that considerable evidence was not presented to the Commission. Where this appears, or where the Commission has reason to doubt that all the evidence has been presented to it, it should either decline to decide the case until all the facts have been presented, or refer the case to its Investigation Division for inquiry and report. The latter course should be followed, I think, only where this is the only way to secure all the facts. It is the duty of the plaintiff to prove its case, and of the defendant to present any coun-

absence of such provisions in the Pawnee agreement tends to indicate that all unalloted land not previously set apart for tribal use, passed to the United States under the 1892 Agreement, and that the subsequent setting apart of the 755-acre tract was the setting apart of land belonging to the United States so that it was not open to settlement but was reserved for the use of the tribe.

tervailing testimony. They have no right to shift this burden to the Commission. Its investigating division is set up to act as an *amicus curiae*, not as a guardian *ad litem* for an infant or **a** *non-compos mentis*.

Certainly there is no duty on an appellate tribunal to search through the dusty documents of the archives to uncover other documents not produced by the parties nor considered by the Commission. In the absence of a well-founded apprehension that all the facts have not been produced and that justice cannot be done without further investigation, I think an appellate tribunal should decide the case on the basis of the record made below.

If there is such a well-founded apprehension on our part, supported by substantial evidence called to our attention or discovered by us, the case should be remanded for further consideration by the Commission. I do not conceive it to be the duty of this court to make the exhaustive investigation which the majority opinion indicates the court has made in this case.

JONES, Chief Judge (dissenting in part).

I believe that the findings of the Indian Claims Commission are supported by substantial evidence, except as to claim five.

I would therefore affirm the findings and conclusions of the Commission, except as to claim five, and the possible recovery on claims three and four, not on the basis of title to the lands, but under subdivision (5), section 2, of the Indian Claims Commission Act.

As to claims three and four I agree with the Commission that it is not established that the Pawnee Tribe of Indians actually occupied and exclusively used any definite portion of the lands claimed to a degree sufficient to warrant a finding of title.

It does seem that the Tribe had certain possessory hunting rights covering a considerable area. When the Tribe made their cessions under the Treaties of 1848 and 1857, they relied on the good faith of the Government in protecting these rights even though the area was not completely defined. The record indicates considerable doubt as to whether these possessory rights were properly protected after the time the cessions were made.

Subdivision (5) of section 2 of the Indian Claims Commission Act confers jurisdiction as to "claims based upon fair and honorable dealings that are not recognized by any existing rule of law or equity."

This is a broad provision and while it may be difficult to place a value on these rights in an area not definitely defined, yet they were valuable rights, and with such evidence as may be at hand or which may be produced these findings should be made. If these values are in excess of the amounts paid, judgment should be rendered for the excess. This phase of the case was not covered by the Commission's findings.

As to claim five, I think the record facts designate the 4,800-acre tract with sufficient clarity to definitely locate it. It should therefore be valued by the Commission, and if the value on the date of taking exceeded the $1.25 per acre paid by the United States, judgment rendered for claimant in the amount of such excess.

I would remand the case for these purposes, but would affirm the action of the Commission in all other respects.

However, as the case is to be remanded, the Commission may wish to reconsider the other claims in the light of the additional evidence, together with that already considered by it.